Rajiv MALIK, Plaintiff–Appellee–
Cross–Appellant,

v.

CARRIER CORP., Defendant–
Appellant–Cross–Appellee,

Regina Kramer, Defendant–
Cross–Appellee.

Docket Nos. 98–7109, 98–7121

United States Court of Appeals,
Second Circuit.

Argued: Dec. 7, 1998

Decided: Jan. 26, 2000

Daniel L. Schwartz, Day, Berry & Howard (Albert Zakarian, Keith S. Marks, of counsel), Stamford, Connecticut, for Defendants–Appellants–Cross–Appellees.

Gregg D. Adler, Livingston, Adler, Pulda & Meiklejohn, P.C., Hartford, Connecticut (Christopher J. Bakes, Bakes & Slenkovich, LLP, Palo Alto, California, of counsel), for Plaintiff–Appellee–Cross–Appellant.

Before: WINTER, Chief Judge, OAKES, and JACOBS, Circuit Judges.

WINTER, Chief Judge:

Carrier Corporation and its former employee, Rajiv Malik, appeal from judgments entered by Judge Goettel before and after a jury trial. Malik's amended complaint alleged six common law claims against Carrier and one of its officers, Regina Kramer, based on events during and prior to Malik's termination. The district court granted judgment as a matter of law on three claims, and Malik withdrew one claim prior to its submission to the jury. The two claims submitted to the jury were for negligent misrepresentation and for negligent infliction of emotional distress ("emotional distress claim"). The jury returned a verdict for Carrier on the former claim and for Malik on the latter claim, for which it awarded $400,000 in damages. Prior to entering judgment, the district court granted Carrier's motion for a new trial unless Malik accepted a judg-

ment of $120,000. Malik accepted the remittitur, and judgment was entered accordingly.

Carrier appeals from the district court's denial of its motion for judgment on the emotional distress claim, and Malik cross-appeals from the court's adverse grant of judgment on his defamation claim against Carrier and his tortious interference with contract claim against Kramer. We reverse the judgment for Malik on the emotional distress claim on the ground that Connecticut law does not permit recovery for an employer's negligent conduct of an investigation into charges of sexual harassment that is required by federal law. We affirm the dismissal of his defamation and tortious interference claims.

## BACKGROUND

### a) Factual Background

Rajiv Malik joined Carrier as an Associate in its Leadership Associate Program ("Program") in August 1992. The Program offers executive training to recent business school graduates. It provides Associates with three or four assignments in different divisions of the company. These assignments expose the Associates to a range of Carrier's operations and personnel and provide Carrier with an opportunity to evaluate each Associate's managerial skills. Associates are expected to earn an offer of an executive position within Carrier from one or more of the divisions in which they have worked. Carrier assists Associates in this quest, but the ultimate responsibility to secure a final placement rests with the Associate. Regina Kramer, Carrier's Manager of Professional Recruitment, was at all pertinent times responsible for administering the Program.

Malik's performance in the Program was generally considered mixed by Carrier executives. His first rotation was with Carrier's Commercial Unitary division. Gerard Geiss, Malik's supervisor on this rotation, rated Malik a "3" on a scale of "1–6," with "1" being the highest score.

Most associates in the Program were rated "1" or "2." For his second rotation, Malik chose to work with Southern California Air Conditioning Distributors ("SCACD") even though SCACD, an independent distributor of Carrier products, could not offer him a position within Carrier. Malik received a strong performance evaluation for his work at SCACD. Malik's third rotation was with Carrier's Building Systems and Services division ("BSS"). Robert Rasp, Malik's supervisor on this rotation, rated him at "target" in five categories and "above target" in one. Malik's final rotation was at Carrier's world headquarters in Farmington, Connecticut. His performance there was considered poor—an assessment with which Malik agreed at trial.

Malik's work at Carrier led to complaints about his conduct toward female workers. During an initial orientation program, a female Associate complained about Malik's highly arrogant and disrespectful behavior towards her. This complaint was forwarded to Kramer.

During Malik's rotation at BSS in Chicago, Alice Fabian, a female administrative employee whose cubicle was located just outside Malik's office, complained to Tom Sheehy, her supervisor, that Malik had made inappropriate sexual comments towards her on several occasions. Sheehy brought Fabian's complaint to the attention of Rasp, who discussed it with Malik. Rasp also reported it to Phyllis Snyder, Carrier's Human Resources Manager for BSS, who in turn told Kramer that a complaint had been made about Malik's conduct. As the person responsible for administering the Program, Kramer decided to look into the complaint.

Sometime in late March 1994, Kramer contacted Rasp, who initially declined to provide any information about Fabian's complaint because he believed that he had resolved the issue to the satisfaction of both Malik and Fabian. To overcome Rasp's reluctance to provide information, Kramer testified that she told him that

"the issue of [Malik's] working with women had come up once before" (referring to the orientation incident) and that she needed to determine whether this incident was similar. Rasp's recollection of this exchange was that Kramer asked, "What if I told you this is not the first time we've had similar incidents with Raj[?]" Rasp testified that he had not interpreted Kramer's statement as necessarily involving sexual harassment. According to Malik, however, Kramer's comments to Rasp could have been construed to mean that there had been a second allegation of sexual harassment made against Malik. After this discussion, rumors regarding Malik's past conduct circulated in the BSS office.

Upon hearing that a second incident of some nature involving Malik had occurred, Rasp described Fabian's complaint to Kramer. Kramer then asked Snyder to investigate Fabian's complaint. Although Fabian desired to have the matter closed, she told Snyder of several sexually-oriented remarks by Malik specifically directed toward Fabian. These included inquiries as to whether Fabian was a virgin when she was married, whether she would go out with him if he was terminally ill, and whether Fabian's husband would "share" her with Malik if he visited their home, supposedly a custom in India. Snyder also discovered that another female employee at BSS in Chicago, Gina Cornick, had complained to her supervisor about inappropriate sexually-oriented remarks by Malik. Although these remarks were not directed at Cornick, she complained that Malik was highly prone to turning the subject matter of every conversation to sex. The supervisor had reported Cornick's remarks about Malik to Rasp. Snyder prepared a memorandum to Kramer relating these facts.

Kramer's call to Rasp was near the end of Malik's tour at BSS, and in his exit interview, Rasp told him of Kramer's reference to a second incident and the imminent investigation into the Fabian matter. Malik testified that he was emotionally devastated upon learning both that Kram-er had alleged a second incident and that an investigation into what had seemed a closed matter had begun.

On April 4, 1994, Malik began his tour at Carrier's world headquarters, where Kramer and Regina Hitchery, Carrier's Vice–President of Human Resources and Kramer's boss, also worked. On April 21, after receiving Snyder's memorandum, Kramer met with Malik to discuss the issue. Malik admitted to making one inappropriate sexually-oriented comment to Fabian—about whether she was a virgin when married—but denied making any other comments either to her or to Cornick. Kramer informed him that she took this matter seriously and would discuss it with Hitchery. She also told Malik that Rasp and other managers had expressed professional concerns over his work and that Rasp had decided not to offer him a full-time position. She stated further that she was concerned that Malik had yet to secure a final placement. Malik testified that this was the first occasion on which he had heard about professional concerns and that Rasp denied sharing any such concerns with Kramer and further denied having decided not to offer Malik a permanent position at BSS in Chicago. Malik then called Hitchery and sought a one-on-one meeting. Hitchery refused to meet Malik without Kramer and expressed complete confidence in Kramer.

On April 25, Kramer and Hitchery met with Malik to inform him that they would not discipline him as a result of the complaints about his behavior. They testified that they told Malik at that time that a Letter of Record regarding the complaints would be placed in his file. However, Malik testified that he was not told about the Letter, and, when it was placed in his file two weeks later, he was surprised and further devastated. The Letter stated in pertinent part:

> After thorough investigation it is my conclusion that while it is clear that discussions of a sexually [sic] nature oc-curred between the two of you the con-

tent and intent of the discussions is disputed. As a result the issue will be closed for lack of substantiation.

While there is nothing to substantiate the claim of sexual harassment your behavior was unacceptable.

The letter was not shown to anyone other than Malik. At the April 25 meeting, Kramer also warned Malik in strong terms of the inadvisability of going over his manager's head, as he had in seeking a one-on-one meeting with Hitchery. By now, Malik testified, he was having difficulty sleeping, was taking various medications, and was unable to perform well in his then-assignment.

Approximately two months later, on July 6, 1994, Malik and Kramer met to discuss Malik's final placement. At Malik's request, Kramer agreed to detail the concerns that had been raised regarding Malik's performance. To this end, on July 11 she provided him with a memorandum outlining the aforementioned concerns, including, primarily, his lack of leadership skills and initiative. The memorandum stated that these concerns would be shared with "prospective hiring managers" at Carrier. On July 21, 1994, Malik responded with his own memorandum to Hitchery, in which he expressed disagreement with Kramer's investigation of his behavior toward Fabian and Cornick and Kramer's comments on his performance in the Program. Malik's memo also made a thinly veiled threat to sue Carrier unless it resolved Malik's concerns and helped him set his career "back on track." Hitchery met with Malik on August 2, 1994, and encouraged him to put the Fabian/Cornick incident behind him and to focus on securing a final placement position. She reminded Malik that it was his, and not Carrier's, responsibility to secure such a position.

Malik, by his own admission, did little to attempt to secure a final placement. After Malik expressed interest in meeting with Nicholas Pinchuk, President of Carrier's Asian Pacific Organization ("APO"), Kramer arranged an interview during which Malik informed Pinchuk that his interest in working for APO was subject to its ability to help him secure permanent resident status in the United States. Other than contacting Ray Carter, manager of Carrier's Costing Group, it is unclear whether Malik made any other efforts at this time to secure final placement.

On August 16, 1994, Hitchery informed Malik that because he had not secured a final placement at the conclusion of the Program, his employment with Carrier was being terminated. She informed Malik that Carrier would continue to pay him through August 31, 1994 and offered him assistance in finding new employment.

b) *Procedural Background*

After his termination by Carrier, Malik filed a complaint in the District of Connecticut alleging numerous violations of federal and state law. The district court granted summary judgment against Malik on his federal claims and dismissed the remaining claims for lack of subject matter jurisdiction. After Malik moved for reconsideration of the dismissal on the ground that the district court had diversity jurisdiction over his state law claims, the court vacated its dismissal of his remaining claims and granted him leave to amend the complaint.

Malik's amended complaint alleged four claims against Carrier: (i) breach of contract, (ii) negligent misrepresentation, (iii) defamation, and (iv) negligent infliction of emotional distress; and two claims against Kramer: (i) defamation and (ii) tortious interference with contract. The district court granted summary judgment for Carrier on the breach of contract and negligent misrepresentation claims but reinstated the negligent misrepresentation claim upon reconsideration. After the case proceeded to trial, Malik withdrew the defamation count against Kramer. At the close of the evidence, the district court granted judgment as a matter of law for Carrier on the remaining defamation count

and for Kramer on the tortious interference count. Thus, only the negligent misrepresentation and emotional distress claims against Carrier went to the jury.

As to the emotional distress claim, the court instructed the jury that, for the plaintiff to prevail, it must find:

> 1, that the defendants' conduct created an unreasonable risk of causing emotional distress; 2, that the defendant knew or should have known that its conduct created this unreasonable risk, and from the facts known to it at the time it acted, that the emotional distress, if caused, might result in illness or bodily harm to the plaintiff; 3, that the defendant's conduct was the proximate or legal cause of plaintiff's emotional distress; and 4, that the emotional distress that the plaintiff suffered was severe.

*Malik v. Carrier Corp.*, 986 F.Supp. 86, 93 (D.Conn.1997).

The jury returned a verdict for Carrier on the negligent misrepresentation claim but for Malik on the emotional distress claim. It awarded him $400,000 in damages. Carrier moved again for judgment as a matter of law on the emotional distress claim, and for a new trial. The court denied Carrier's motion for judgment, *see id.* at 96, but conditionally granted its motion for a new trial subject to Malik's decision to accept a final judgment of $120,000. Malik accepted the remittitur. Carrier appeals from both the denial of its motion for judgment and the decision not to reduce the damages award below $120,-000. Malik cross-appeals from the court's adverse grant of judgment on his defamation and tortious interference claims.

## DISCUSSION

### a) *Carrier's Appeal*

 Because Carrier's motion for judgment on Malik's emotional distress claim should have been granted, we need

not address the size of the damage award. We review *de novo* the grant or denial of a motion for judgment as a matter of law. *See Muller v. Costello*, 187 F.3d 298, 312 (2d Cir.1999). Judgment as a matter of law is appropriate if no reasonable factfinder could have viewed the evidence as supporting the plaintiff's claim. *See Krause v. Bennett*, 887 F.2d 362, 368 (2d Cir.1989).

The parties have briefed at length their conflicting views as to the elements of a negligent infliction of emotional distress claim under Connecticut law. American law in this area has not been stable, but there is a discernible movement in the direction of expanding the right to recover for such distress. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 54, at 359–67 (5th ed.1984). Various courts have imposed limits on such claims, however, such as requirements that the emotional injury be accompanied by some physical harm or that recovery for emotional injury be "parasitic" on a claim involving a breach of some duty independent of any obligation not to cause emotional distress. *See id.* at 361 (stating that a majority of courts do not allow recovery for emotional distress in the absence of a physical injury or an independent basis of tort liability). Connecticut law is less than clear on these issues. *Compare Montinieri v. Southern New England Tel. Co.*, 175 Conn. 337, 398 A.2d 1180 (1978) (holding that recovery for negligent infliction of emotional distress claim does not require proof of physical injury, or the risk thereof, but apparently requiring breach of an independent duty in tort to state such a claim), *with Morris v. Hartford Courant Co.*, 200 Conn. 676, 513 A.2d 66 (1986) (affirming dismissal of negligent infliction of emotional distress claim that failed to allege foreseeable injury, but noting that such a claim need not be premised upon breach of an independent duty).[1]

1. Carrier also contends that under Connecticut law the tort of negligent infliction of emotional distress is limited in the employment

context to actions taken in the course of an employee's termination. Because the alleged actions supporting Malik's emotional distress

Carrier also contends that the district court erred in not directing a verdict because Malik failed to introduce sufficient evidence as to the scope of the duty it owed to him. In particular, Carrier argues that expert testimony was required. *See Santopietro v. City of New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996) ("If the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required."). Carrier also notes in this regard that allegations of sexual harassment trigger federal law and an attendant duty imposed upon employers to take reasonable steps to correct harassing behavior, including, where appropriate, conducting an investigation. *See Torres v. Pisano*, 116 F.3d 625, 636 (2d Cir.1997) ("[A]n employer may not stand by and allow an employee to be subjected to . . . harassment by co-workers. . . . [O]nce an employer has knowledge of the harassment, . . . the employer [has] a duty to take . . . steps to eliminate it.") (internal quotation marks omitted); *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986). That being the case, Carrier argues, specialized knowledge is necessary for a jury

to understand that only a circumscribed duty to avoid emotional injury, if any, was owed to Malik. Malik's brief responds that Connecticut does not generally require expert testimony and that this case is not similar to ones involving specialized professionals. The brief does not mention federal law.

Finally, Carrier argues that as a matter of law it did not act negligently. It contends, *inter alia*, that Kramer's investigation of the allegations of sexual harassment could not have constituted negligence because it was required by federal law. *See id.* Malik again does not respond to Carrier's invocation of federal law.

■ Both the question of whether a claim for the negligent infliction of emotional distress exists under Connecticut law for acts in the employment context and whether such a claim may succeed here absent expert testimony are issues of Connecticut law as to which considerable doubt exists. Certification of the issues to the Connecticut Supreme Court might seem appropriate. *See Fraser v. United States*, 30 F.3d 18 (2d Cir.1994) (certifying

claim—primarily the sexual harassment investigation and Letter of Record—occurred prior to his termination, Carrier contends that Malik's claims fail as a matter of law. *See Parsons v. United Technologies Corp.*, 243 Conn. 66, 88, 700 A.2d 655 (1997) ("[N]egligent infliction of emotional distress in the employment context arises only where it is 'based upon unreasonable conduct of the defendant in the termination process.'" (*quoting Morris v. Hartford Courant Co.*, 200 Conn. 676, 682, 513 A.2d 66 (1986))). However, prior to 1993, Connecticut's Worker's Compensation Act covered both physical and emotional injuries that occurred in the workplace, and a negligence claim for such injuries was therefore precluded. *See Karanda v. Pratt & Whitney Aircraft*, No. CV-98-5820255, 1999 WL 329703, at *4 (Conn.Super.Ct. May 10, 1999). *Morris* may well have reflected an effort to permit certain claims—those regarding termination alone—to be brought despite the Worker's Compensation Act.

Since *Morris*, Connecticut has amended its Worker's Compensation Act to exclude coverage for mental and emotional impairment.

*See* 1993 Conn. Acts 93–228, § 1 (codified as Conn. Gen.Stat. § 31–275(16)). At least one lower Connecticut court has taken the view that because emotional distress injuries are no longer covered by the Act, emotional distress claims are also not precluded by it. *See Karanda*, 1999 WL 329703, at *5 ("Based upon the effects of [Conn. Gen.Stat. § 31–275(16)], and the intent of the legislature in passing that act, the court can reasonably conclude that the Supreme Court [of Connecticut] would permit a negligent infliction of emotional distress claim against an employer when no termination is alleged.").

Finally, we note that the Connecticut Supreme Court has arguably acknowledged the possibility that such a claim might arise in the employment context. *See Parsons*, 243 Conn. at 89, 700 A.2d 655 (noting that "few courts have addressed the requirements of a claim for [emotional distress] within the context of an employment relationship as a whole, much less in the context of the termination of such a relationship"). Whether a viable emotional distress claim for negligent acts in the employment context exists under Connecticut law is thus unclear.

state-law questions to Connecticut Supreme Court pursuant to 2d Cir. Local R. 0.27 and Conn. Gen.Stat. § 51–199a where extant Connecticut case law did not squarely address certified issues). However, we may assume that Connecticut law does, as it must, conform to overriding federal law, and we view these state law issues as being dispositively resolved in these circumstances by federal law.

Malik relies upon the same basic set of facts to support his emotional distress claim, which is based on negligence, and his defamation and tortious interference with contractual relations claims, which are based on intentional conduct. These facts—which the jury could have found on the evidence—are: (i) Kramer's initiation of an investigation into Fabian's reporting of several incidents of inappropriate sexual remarks directed to her by Malik; (ii) Kramer's persistence in continuing the investigation in the face of Rasp's desire to close the incident; (iii) Kramer's statement to Rasp that Fabian was not the first one to complain about Malik's conduct, an ambiguous remark that might have been, or was, taken to mean that another sexual harassment claim had been made; (iv) Malik's innocence of all but one inappropriate remark to Fabian for which he apologized; (v) Malik's innocence of inappropriate conduct in Cornick's presence; (vi) Hitchery's failure to meet with Malik at times and circumstances of his choosing; (vii) Kramer's placing of the Letter of Record in Malik's personnel file after telling him that he would not be disciplined for sexual harassment; (viii) Kramer's false assertion to Malik that some of his supervisors had expressed concerns over his past performance; (ix) Kramer's admonition to Malik not to go over a manager's head; and (x) Kramer's memo to Malik about those concerns that was also placed in his personnel file.

The outlines of Malik's intentional tort claims are more easily discerned from the facts identified above than are the outlines of his negligence claim. In Malik's view,

Kramer's report to Rasp of a second incident involving Malik was defamatory. Also in Malik's view, Kramer engaged in a personal vendetta against him, aggravated by her anger at Malik's attempt to go over her head to Hitchery, which cost him his job at Carrier. These claims, which have insufficient evidentiary support, are discussed *infra.*

■ The negligence claim is not so easily capsulized. The expression of professional concerns and Hitchery's failure to meet with Malik at times and circumstances of his choosing hardly amount to actionable negligence. A disagreement over an employee's quality of performance accompanied by an employer's adherence to the chain of command, absent intentional and malicious falsehoods or conduct of an egregious and clearly overreaching nature, cannot render an employer liable for the emotional distress of an employee under any accepted legal theory. Indeed, Malik's papers complain of the harm from lack of feedback and the harmfulness of the feedback he got in almost equal measure. The crux of his negligence claim, therefore, is the quite credible emotional harm caused by Kramer's pressing of the sexual harassment investigation and the placing of the Letter of Record in his personnel file.

■ However, an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking; under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer. *See Faragher v. City of Boca Raton,* 524 U.S. 775, ——– ——, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); *Torres,* 116 F.3d at 636; *Snell,* 782 F.2d at 1104; 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."). Moreover, the

knowledge of corporate officers of such conduct can in many circumstances be imputed to a company under agency principles. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, ——— ———, 118 S.Ct. 2257, 2265–71, 141 L.Ed.2d 633 (1998). As a result, an employer must consider not only the behavior of the alleged offender, but also the response, if any, of its managers. Nor is the company's duty to investigate subordinated to the victim's desire to let the matter drop. Prudent employers will compel harassing employees to cease all such conduct and will not, even at a victim's request, tolerate inappropriate conduct that may, if not halted immediately, create a hostile environment. *See Faragher,* 524 U.S. at ——, 118 S.Ct. at 2283. Finally, it goes without saying that an employer's obligations in this regard do not cease because the alleged harasser denies inappropriate conduct.

The issue here is not the proper balance between employee rights and employer authority under state law. The issue is how to ensure that federal policies are not undermined by imposing on employers legal duties enforceable by damages that reduce their incentives to take reasonable corrective action as required by federal law.

 Viewed in that perspective, corrective actions that a risk-averse employer might take to comply with federal law may not give rise to a negligence action, whether the rationale is couched in terms of breach, legal duty, or privilege.[2] Connecticut recognizes that emotional distress claims may be precluded by legal imperatives attendant to the workplace. *See Morris,* 200 Conn. at 682 n. 4, 513 A.2d 66 (noting potential limits on emotional distress claim in workplace context). Indeed, legal duty and privilege are generally considered defenses only to intentional torts because implicit in the very concept of negligence is that legally protected conduct cannot also be a breach of a legal duty. *See Petyan v. Ellis,* 200 Conn. 243,

254, 510 A.2d 1337 (1986) ("Regardless of how the defendant's conduct is categorized . . . since her comment . . . was absolutely privileged, she would not be liable for the intentional infliction of emotional distress in any event.").

 Given the jury instructions regarding Malik's emotional distress claim—which, if such a claim exists under Connecticut law, are unremarkable—virtually any employer investigation into allegations of sexual harassment would expose the employer to liability. Such investigations foreseeably produce emotional distress—often in copious amounts—in alleged harassers, whether guilty or innocent. As with any investigation into potentially embarrassing personal interactions, confidentiality is difficult or impossible to maintain if all pertinent information is to be acquired from all possible sources. Denials by an accused cannot of themselves bring the matter to an end. Even if the charge proves demonstrably baseless, the very existence of the investigation may give the charge temporary or even permanent credibility among some persons. Moreover, investigators may have to overcome resistance because of a tendency in the immediate worksite—among victims as well as their on-site supervisors—to close the matter informally in the hope of preserving some measure of harmony. Upper-level management has a good reason to press the investigation, however, even at the risk of misunderstandings that cause great emotional distress. This is so because, once higher management has notice of the problem, it may later face civil liability if it fails to look into the problem and act to prevent recurrence or expansion. *See Gallagher v. Delaney,* 139 F.3d 338, 348 (2d Cir.1998) ("If an alleged victim of sexual harassment asks a person of authority to whom she has reported the harassment to keep it confidential, and the employer . . . honor[s] her request, it risks

---

**2.** Because we see no conflict between federal and Connecticut law, we need not reach the question of at what point federal law might preempt a state common law tort claim.

liability for not quickly and effectively remedying the situation."); *Torres,* 116 F.3d at 639 (noting that, where an employer knows that an employee has allegedly harassed multiple co-workers, an employer is not justified in closing an investigation at the request of a single harassed employee).

■ An employer's conduct of an investigation and determination of its scope must be viewed *ex ante* and take into account that, from the employer's viewpoint, worst-case scenarios must govern its conduct. For example, if another employee later brought an action against Carrier alleging inappropriate sexually-related conduct by Malik, scrutiny of Carrier's conduct would begin upon its first notice of harassment by an employee—when Fabian complained of several acts of sexual harassment by Malik. Kramer, as Carrier's responsible official in this regard, could not, therefore, assume either that Fabian's report was false or, if true, reflected behavior that was unlikely to continue. *See Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 65 (2d Cir.1998) (employer whose only response to sexual harassment complaint was to discuss allegation with harasser did not take reasonable steps to remedy hostile work environment). Rather, Kramer had to act on a worst-case scenario in which another then-unknown complainant might look to Carrier for damages. Under federal law, she could not desist from such an investigation because of the potential for bruising Malik's feelings. *Cf. Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 432 (7th Cir.1995) (holding that employer took reasonable steps to remedy alleged sexual harassment by, among other things, placing alleged harasser on probation and suspending a scheduled salary increase).

Had Kramer desisted when Rasp refused to cooperate and the worst-case scenario became reality—*i.e.,* another female employee sued Carrier for harassment by Malik—even a modestly skilled trial lawyer could present a powerful case for the plaintiff to a jury. This case would depict Malik as a male employee known to Kramer to have a record of arrogance toward a female peer and to have repeatedly harassed a female administrative employee. It would depict Rasp as a supervisor who refused to provide information to Kramer about Fabian's report of harassment even though he knew that a second female employee in that office—Cornick—had complained of Malik's persistent turning of conversations to sexual matters. Had Kramer desisted at Rasp's request, both would be depicted to a jury as hear-no-evil, see-no-evil, speak-no-evil supervisors, and a jury might find that Carrier had not complied with federal law in failing to make a thorough investigation and take appropriate precautionary action. Carrier could hardly expect to prevail in such a case on the ground that an investigation would cause foreseeable emotional distress to Malik.

Nor can federal policies be effectuated if such an investigation must cease because the accused denies the acts charged or because there is a danger of misunderstandings between the investigators and the accused. To be sure, the jury here could have found, based upon Malik's testimony, that Malik engaged in only a single inappropriate act. However, if employers must fear sexual harassment liability based on such *ex post* findings, they will be deterred from taking reasonable corrective action—including, where appropriate, conducting an investigation—as required by federal law. So too, the placing of the Letter of Record in Malik's file cannot be the basis for liability without undermining federal policy. Although Carrier could not resolve the conflicts between Fabian's and Cornick's view of events and Malik's version, he had admitted to one inappropriate remark, and Carrier had to inform him of the seriousness of the issues. Again, in a worst-case scenario, Carrier's failure to express its concerns in concrete form might well be a deficient response under federal law.

Finally, the jury could have found, again based on Malik's testimony, that Carrier carelessly led him to believe on at least two occasions that the matter was closed— first, when Rasp seemingly settled the issue with Fabian and later when Hitchery and Kramer told him he would not be disciplined but did not, according to Malik, mention the Letter of Record. Both when Kramer pressed the investigation and later placed the Letter of Record in his personnel file, Malik was surprised and emotionally damaged. Again, however, it would be an uncommon investigation into allegations of sexual harassment that did not result in similar misunderstandings given the emotional and confrontational circumstances that generally attend them.

The only remaining basis for Malik's emotional distress claim is Kramer's description to Rasp of the orientation incident, which the jury could have found to have been carelessly ambiguous. There are different versions of this conversation and of Rasp's understanding of it. We agree with Malik, however, that a jury could have found that Rasp reasonably understood that Kramer was referring to a second incident of sexual harassment rather than to acts of arrogance toward a female peer. Nevertheless, we again note that investigations of this nature inevitably entail risks of misunderstandings or statements that a trier might *ex post* find to be careless. An employer simply cannot be diligent in carrying out an investigation if it must weigh every sentence or question with an eye to whether a jury might later conclude that it unreasonably injured an alleged harasser's psyche. Indeed, while a jury might well conclude that Kramer was negligent in her lack of specificity, it is also the case that one investigating a charge of sexual harassment might reasonably believe that the prior incident was not without relevance. Finally, we conclude *infra* that any and all versions of Kramer's statement are privileged with regard to Malik's defamation and tortious interference claims. It would be entirely anomalous to assess liability for it in negligence.

Malik's emotional distress claim therefore fails as a matter of law. Because the events upon which his claim rests are common to investigations into sexual harassment allegations under federal law, we need not describe with precision the kind of egregious or outrageous acts that might legitimately support a state law claim in such circumstances.

### b) *Malik's Cross–Appeal*

Malik contends on his cross-appeal that the district court erred in granting judgment as a matter of law for Carrier on his defamation claim and for Kramer on his tortious interference with contract claim. We disagree.

 Under Connecticut law, liability for defamation requires proof "that the defendants published false statements that harmed the [plaintiff], and that the defendants were not privileged to do so." *Kelley v. Bonney*, 221 Conn. 549, 563, 606 A.2d 693 (1992). Connecticut affords a qualified privilege to intracorporate communications. *See Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 29, 662 A.2d 89 (1995) ("Such communications . . . are necessary to effectuate the interests of the employer in efficiently managing its business."). "There are two facets to the defense of privilege. The occasion must be one of privilege, and the privilege must not be abused. . . . Whether the privilege was abused . . . depends upon whether there was malice in fact . . . in uttering and broadcasting the alleged defamatory matter." *Id.* at 28, 662 A.2d 89 (internal quotation marks omitted).

 Malik's defamation claim is based on Kramer's statement to Rasp regarding the orientation incident involving Malik. This conversation was an intracorporate communication and can support a defamation claim only if the attendant privilege was abused. A finding of abuse would require a showing of malice in fact.

*See id.* The district court granted judgment as a matter of law on this claim because it found that "[t]here has been no proof at all that Ms. Kramer had any question in her mind about the truth of what she was saying, even though she may not have expressed it fully, nor is there any indication that she harbored malice about the plaintiff." We agree.

As an initial matter, we note that Kramer's statement to Rasp may well have been sufficiently accurate to preclude a defamation action based upon it. *See Kelley,* 221 Conn. at 563, 606 A.2d 693 (statements must be false); *Strada v. Connecticut Newspapers, Inc.,* 193 Conn. 313, 316, 477 A.2d 1005 (1984) ("Truth is an absolute defense to an allegation of libel."); *id.* at 322, 477 A.2d 1005 (minor errors in a statement that is substantially true not enough to give rise to liability). Malik admits to both an inappropriate sexual comment to Fabian and arrogant conduct toward a female coworker. These incidents are in certain respects similar—*i.e.*, both involved inappropriate behavior towards female employees—and nothing in Rasp's or Kramer's testimony suggests that Kramer specifically stated that the prior incident involved sexual harassment. Moreover, Kramer called Rasp to learn about the nature of Fabian's allegation. She thus could not have known the precise differences between these incidents until Rasp discussed the matter further—a fact that Rasp must have known as well.

In any event, we agree with the district court that there is no evidence from which a reasonable jury could have concluded that Kramer acted with actual malice in making the statement in question. First, as noted above, Carrier had an affirmative duty to investigate the report of an allegation of sexual harassment. Kramer's request that Rasp share his knowledge of this incident was thus more than reasonable. Second, even if Kramer's statement conveyed a mistaken impression to Rasp, it was arguably accurate, and, at worst, only marginally inaccurate, further under-

mining any claim that she acted with malice in fact. Nor can one argue that Kramer acted with malice because she resented Malik's going over her head by complaining to Hitchery of Kramer's investigation. Kramer's discussion with Rasp was in March and before Malik's April request to Hitchery for a one-on-one meeting, thus eliminating any claimed evidentiary support for the theory that Kramer had a malicious motive when she spoke to Rasp.

We also affirm the grant of judgment as a matter of law on Malik's tortious interference with contract claim. Under Connecticut law,

> [a]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract. An agent, however, can be held liable for such interference or inducement if he did not act legitimately within his scope of duty but used the corporate power improperly for personal gain.

*Boulevard Assocs. v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1036 (2d Cir.1995) (quoting *Murray v. Bridgeport Hosp.,* 40 Conn.Supp. 56, 60–61, 480 A.2d 610 (Conn.Super.Ct.1984)); *see also Espinosa v. Connecticut College,* No. 52 28 72, 1994 WL 320222, at *5 (Conn.Super.Ct. June 27, 1994) ("In order to deprive a corporate employee of his immunity, the plaintiff must establish that he acted solely for his own benefit and benefit to the corporation played no role therein.").

It is undisputed that Kramer is presumptively entitled to immunity for actions taken in the scope of her employment. Malik's theory is that her continuing to investigate him, placing a Letter of Record in his personnel file, and outlining concerns with his workplace performance, were undertaken out of animosity towards him and to conceal her own errors of judg-

ment. In essence, he contends that the "personal gain" prong of the tortious interference test may be satisfied by the emotional satisfaction derived from injuring one who is disliked by the defendant. The district court apparently accepted this view of the law but nevertheless granted Kramer's motion for judgment on this claim because there was legally insufficient evidence that her actions towards Malik were taken "out of personal advantage and for her own benefit." We again agree.

Even assuming *arguendo* that motivations of the sort alleged here are sufficient to support a claim for tortious interference with contract, it is manifest that Kramer's actions towards Malik were in furtherance of her professional duties. It cannot, therefore, be said that Kramer took such actions "solely for [her] own benefit" or that "benefit to the corporation played no role therein." *Espinosa*, 1994 WL 320222, at *5.

Kramer's actions with respect to Malik constitute ordinary, garden-variety personnel actions. For reasons discussed above, her decision to investigate Fabian's allegation against Malik was a sound one made in accordance with Carrier's federally imposed obligation to take reasonable corrective action. The other actions of which Malik complains are Kramer's decision to place a Letter of Record in his personnel file and her outlining of performance concerns to him. However, the Letter of Record was under the circumstances rather favorable, and Malik concedes that he specifically asked Kramer to advise him of the performance concerns. Moreover, the trial record indicated that the decision to issue the Letter was made by Hitchery as well as Kramer.

## CONCLUSION

For the reasons stated above, we reverse the orders denying judgment as a matter of law to Carrier on the emotional distress claim and affirm the order granting judgment to Carrier on the defamation and tortious interference claims.