WALLACE, Judge:
The district court entered summary judgment dismissing Hardage’s sexual harassment and retaliation claims against CBS Broadcasting Inc., Viacom Television Stations Inc., and Viacom Broadcasting of Seattle Inc. (collectively, CBS), pursuant to Title VII of the 1964 Civil Rights Act and the Washington Law Against Discrimination (WLAD). The district court concluded that CBS was entitled to assert an affirmative defense to liability based on the Supreme Court’s decisions in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and it accordingly denied Hard-age’s motion for partial summary judgment on that issue. In addition, the court declined to exercise supplemental jurisdiction over Hardage’s WLAD claims against Kathy Sparks (the alleged harasser) and dismissed those claims without prejudice. See 28 U.S.C. § 1367(c). The court also dismissed Hardage’s Title VII claims against Sparks with prejudice, and Hard-age does not appeal this portion of the court’s judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.
I.
In the summer of 1998, Hardage began working as an advertising account executive for KSTW-TV, a television station owned by Viacom Television Stations, Inc. and managed by CBS Broadcasting Inc. He was promoted to Local Sales Manager in February of 2000, and in this position he worked with another Local Sales Manager, Nadene Stauffer, to manage and supervise the account executives. Both Hardage and Stauffer were supervised by Patty Dean, the General Sales Manager, who was in turn supervised by defendant Sparks, the station’s General Manager. Until about a month before Hardage resigned in August of 2001, he worked in the Seattle sales office whereas Sparks worked in the management office in Tacoma.
Hardage contends he was sexually harassed by Sparks on several occasions and subjected to retaliation after he rejected her advances. He alleges that during Sparks’ visits to the Seattle office, she repeatedly flirted with him and made inap *1181 propriate comments—such as “[y]ou need somebody that’s older and more stable that can take care of you.” Leo Elbert, another employee at KSTW, stated that Sparks would “camp out” in Hardage’s office, kick back in his chair with her feet on his desk, and smile and giggle in a flirtatious manner. Hardage asserts that he never flirted with Sparks, but that he is a “flirtatious person by nature” and that there was “playful banter from the git-go” with Sparks, some of which he concedes could have been perceived as mutually flirtatious. He has also stated that he referred to Sparks as “Sparkalicious,” “Bas-kin Robbins 32nd Flavor” and “Driving Ms. Sparky.” He also agreed in his deposition that his love life in general was “[d]efinitely” part of the “watercooler talk” and “a big topic of conversation around the office.”
In addition to the charged workplace harassment, Hardage alleges more serious harassment on five occasions outside of the office. First, on Easter Sunday in 2000, Hardage, Sparks, Dean, Dean’s husband, and a few others attended a brunch at the Sorrento Hotel. Hardage believes that he might have been the person who invited Sparks to the event. The group consumed alcoholic beverages and eventually relocated to a sports bar. Hardage drove Sparks in her car. After a few more drinks, Sparks allegedly asked Hardage if her hands were pretty, and then put her foot on an air hockey table while Hardage was playing and asked if he thought she had cute feet. Later, while Hardage was on a skateboard game, Sparks allegedly got up on the skateboard behind him, put her arms around his waist and told him that he had a “cute ass.”
After the sports bar, the group went to the Paragon restaurant for dinner and continued drinking alcoholic beverages. Sparks sat across the table from Hardage and allegedly took off her shoe, slid under the table, and put her foot in Hardage’s crotch. At the end of the dinner, many people commented that Sparks was too drunk to drive home, and Sparks asked if she could stay at Hardage’s apartment for the night. Hardage declined her request and, according to one witness, Sparks became “livid” and “stormed off’ to drive herself home.
The second incident of harassment outside the workplace allegedly occurred two days after the Easter Sunday events. Sparks called Hardage and invited him to the Icon Grill restaurant for drinks after work. At the restaurant, she allegedly told Hardage she had not been able to sleep and “was having orgasms in her sleep.” She asked Hardage if he felt the same way about her; Hardage replied that he did not want to damage his career by having a relationship and wanted to go no further than friendship. Hardage asserts that Sparks responded with a snide comment along the lines of, “Don’t forget who got you to where you are.”
Third, in August of 2000, Hardage and Sparks were both traveling to Texas to visit their respective families. Sparks arranged her travel plans so that she and Hardage sat next to each other on the same flight. Hardage alleges that Sparks took off her shoe and started rubbing her foot on his leg. After he asked her to stop, she began rubbing his back “in a kind of a weird manner.” Sparks later referred to Hardage as her boyfriend as she was ordering drinks from a flight attendant, and as they were consuming their drinks, she grabbed his hand and made explicit sexual advances. Hardage contends that she offered him oral sex and told him that one experience of sexual intercourse with her would be life-altering for him. Hard-age told her that nothing physical would happen between them.
*1182 The fourth incident of alleged harassment occurred in October of 2000, when Hardage and Sparks took some of KSTW’s clients to a baseball game. This is the only alleged instance of harassment outside the workplace that occurred during a work-related event. Hardage and Spai'ks sat next to each other, and Sparks began rubbing his leg with her foot. Hardage responded, “Kathy, cut it out, you know, we got clients sitting next to us, it’s inappropriate.” Later, Sparks allegedly took off her rain poncho, put it over Hardage’s lap and reached under it for Hardage’s crotch. Hardage states he elbowed her hand away and told her to stop.
After the game, Hardage invited Sparks to join him for drinks with his friends at the Pesos bar. Sparks allegedly glared at Hardage while he greeted his friends, including several women, and shouted, “Who haven’t you f—ed in here?” Hardage states he pointed to one woman and responded jokingly, “I haven’t f—ed anybody in here, you know, but hopefully she’s next.” Sparks became very upset, asked to be taken back to her car, and shouted obscenities to Hardage. One witness, Leo Elbert, has stated that Sparks told Hard-age, “Don’t f—ing talk to me. You’re finished.”
The day after the Pesos incident, Hard-age complained to Dean and told her that “[ljast night, things went way too far” and that Sparks had lost her temper. However, Hardage has stated that he did not tell her “specifics about sexual contact” and never told Dean that Sparks had touched him in an inappropriate way, nor did he share any details of the harassment with anyone else at work.
Hardage also testified that Dean later suggested something “to the effect of ... ‘Why don’t you just do it and get it over with. It may put her in a better mood.’ ” However, when Hardage told Dean about the Pesos incident, Dean promptly contacted Ray Rajewski, an executive vice president, who in turn called Hardage to let him know that he would be contacted by Paul Falcone, a representative from the company’s human resources department. Falcone called Hardage the same day of Hardage’s complaint and arranged to meet with him in person the following week.
During their subsequent meeting— which occurred while Hardage drove Fal-cone to the airport—he did not give Fal-cone details about the harassment; indeed, he “didn’t share any of the so-called gory details with anybody.” Instead, he gave Falcone “|j]ust the broad statement ... that [Sparks] had made ... unwanted sexual advances that were denied,” that he was uncomfortable with the situation, and that Sparks had lost her temper and was “jeopardizing ... the success of the team.” Hardage did not tell Falcone about any of the alleged physical contact or groping by Sparks.
It is also undisputed that although Fal-cone offered to talk to Sparks and treat Hardage’s complaint as an anonymous complaint, Hardage insisted on handling the situation by himself. Hardage explained in his deposition that he did not think the complaint could be handled truly anonymously, because Sparks would know the source, and that he “prided [him]self in handling [his] own business affairs.” Approximately two weeks after their meeting, Falcone called Hardage to follow up, and Hardage informed Falcone that nothing new had happened and that he still did not want Falcone to intervene.
In addition to sexual harassment, Hard-age contends he was subjected to retaliation. Sparks made snide comments, such as, “your number’s up” and, “It’s not going to be me that loses my job, it’s going to be you.”
About the same time, Hardage’s performance was called into question. When *1183 Hardage and another Local Sales Manager, Stauffer, repeatedly failed to meet sales goals due to a slump in the advertising market, Dean counseled them on several occasions and sent them joint memo-randa discussing their performance issues. Furthermore, on August 6, 2001, Dean sent Hardage a memorandum which cited problems with his work performance, including his insubordination in failing to return to work after attending a charity event. Hardage has conceded that he had in fact been insubordinate. The memorandum indicated that Hardage and Dean would have a formal meeting to reevaluate his performance in approximately thirty days, and it warned that a “[flailure to see significant improvement could result in [his] termination.”
On August 31, 2001, Hardage submitted his letter of resignation. He testified that adverse market conditions had created a “pretty intense environment” and had “deflated [him] to the point that ... was the end of [his] rope.”
II.
Hardage asserts Title VII and WLAD claims of sexual harassment and retaliation against CBS. “Washington’s Law Against Discrimination tracks federal law, and thus our analysis will cite only federal law,” but our analysis applies with equal force to Hardage’s WLAD claims against CBS. Anderson v. Pac. Mar. Ass’n, 336 F.3d 924, 925 n. 1 (9th Cir.2003), citing Payne v. Children’s Home Soc’y, Inc., 77 Wash.App. 507, 892 P.2d 1102, 1105-06 (1995); see also Little v. Windermere Relocation, Inc., 301 F.3d 958, 966, 969 (9th Cir.2002) (Washington courts look to federal law when considering sex discrimination and retaliation claims).
We review the district court’s summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact and whether the district court correctly applied relevant substantive law. Kohler v. Inter-Tel Techs., 244 F.3d 1167, 1171 (9th Cir.2001). “[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).
III.
Title VII provides that it is “an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s ... sex.” 42 U.S.C. § 2000e-2(a)(l). This anti-discrimination principle is violated when sexual harassment is sufficiently severe or pervasive to “alter the conditions of[the victim’s] employment and create an abusive working environment.” Montero v. Agco Corp., 192 F.3d 856, 860 (9th Cir.1999) (alteration in original), quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir.1982).
An employer is vicariously liable “for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.” Id. at 861. However, the Supreme Court has established an affirmative defense to vicarious liability:
When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises *1184 two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. ... No affirmative defense is available, however, when the supervisor’s harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.
Ellerth, 524 U.S. at 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807-08, 118 S.Ct. 2275. Thus, even if we assume that Hard-age was sexually harassed, CBS can avoid liability if it can show that (1) it took no “tangible employment action” against Hardage, (2) it exercised reasonable care to prevent and correct harassment, and (3) Hardage unreasonably failed to take advantage of preventive or corrective opportunities. We must determine whether, even viewing the evidence in the light most favorable to Hardage, he has failed to raise a triable factual issue as to each element of this defense, thus entitling CBS to summary judgment.
A.
A “tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.” Ellerth, 524 U.S. at 761, 118 S.Ct. 2257. A tangible employment action “requires an official act of the enterprise, a company act,” and “in most cases inflicts direct economic harm.” Id. at 762, 118 S.Ct. 2257.
While employed at KSTW-TV, Hardage never experienced any decrease in compensation, hours, title, duties or benefits. He contends, however, that he was constructively discharged as a result of a hostile work environment, and this constructive discharge constitutes a tangible employment action. See Pa. State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2351, 159 L.Ed.2d 204 (2004) (holding that constructive discharge precipitated by a supervisor’s official act can constitute a “tangible employment action”). He cites the sexual harassment by Sparks as well as allegedly retaliatory actions—namely, the adverse performance memoranda he and Stauffer received, Sparks’ snide remarks, and the August 6, 2001 memorandum warning Hardage that his performance would be reevaluated after a thirty-day period. He contends that after “enduring the severe and pervasive harassment ... and retaliation,” he “finally came to the conclusion that CBS would not take his complaints seriously” and saw “no way out” but to resign. He also argues he was constructively discharged by being placed on “the same kind of probation under which [he] had seen other employees consistently lose their jobs.”
These arguments miss the mark. In order to survive summary judgment on a constructive discharge claim, a plaintiff “must show there are triable issues of fact as to whether ‘a reasonable person in [his] position would have felt that [he] was forced to quit because of intolerable and discriminatory working conditions.’ ” Steiner v. Showboat Operating Co., 25 F.3d 1459, 1465 (9th Cir.1994); see also Suders, 124 S.Ct. at 2347. In Montero, 192 F.3d at 861, we held that the plaintiff was not constructively discharged in part because the sexually harassing behavior had ceased three to four months before the plaintiffs resignation. See also Steiner, 25 F.3d at 1465-66; Manatt v. Bank of Am., NA, 339 F.3d 792, 804 (9th Cir.2003). Hardage concedes that the last time Sparks made inappropriate sexual advances or comments was in March of 2001, *1185 yet he did not resign until five months later, on August 31, 2001. As a result, even if Sparks’ sexual harassment created a hostile work environment, such harassment ceased well in advance of Hardage’s resignation.
Nor do the allegedly retaliatory actions taken against Hardage amount to a constructive discharge. CBS has proffered legitimate, non-retaliatory reasons for the adverse performance memoranda, which were addressed to both Hardage and Stauffer. See Brooks v. City of San Mateo, 229 F.3d 917, 930 (9th Cir.2000) (“[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become ‘sufficiently extraordinary and egregious’ ” (citation omitted) (emphasis added)). Indeed, it is undisputed that Hardage was insubordinate and failed to meet sales goals in his last few months as a Local Sales Manager.
For this reason, even if we consider the memoranda as tangible employment actions in and of themselves, rather than as components of a constructive discharge, they do not bar CBS from asserting the Ellerth/Faragher defense. See Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 959 (9th Cir.2004) (“[E]ven if a tangible employment action occurred, an employer may still assert the affirmative defense if the tangible employment action ‘was unrelated to any harassment or complaint thereof ” (quoting Nichols v. Azteca Rest. Enter., Inc., 256 F.3d 864, 877 (9th Cir.2001))); Kohler, 244 F.3d at 1180 (“Kohler cannot connect any of the alleged employment actions she experienced to her rejection of [her supervisor]^ advances. Therefore, Kohler has failed to demonstrate a disputed factual issue as to whether she suffered a tangible employment action”).
As for the allegedly snide remarks, the Supreme Court has emphasized that only a constructive discharge which is precipitated by an “official act” can constitute a “tangible employment action.” Sliders, 124 S.Ct. at 2355. An official act is “ ‘the means by which the supervisor brings the official power of the enterprise to bear on subordinates.’ ” Id. at 2353, quoting Ellerth, 524 U.S. at 762, 118 S.Ct. 2257. Sparks’ occasional comments clearly are insufficient under this standard. Thus, Hardage has failed to establish a material factual dispute as to whether he was constructively discharged, and he has not alleged any other “tangible employment action.”
B.
In order to assert the Ellerth/Faragher defense successfully, CBS must have “exereise[d] reasonable care to prevent and correct promptly any sexually harassing behavior.” Ellerth, 524 U.S. at 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807, 118 S.Ct. 2275. In Kohler, 244 F.3d at 1180-81, we construed this standard to require both preventive and remedial measures.
As for the former, we held that an employer’s adoption of an anti-harassment “policy and its efforts to disseminate the policy to its employees establish that [the employer] exercised reasonable care to prevent sexual harassment in the workplace.” Id. at 1180; see also Ellerth, 524 U.S. at 765, 118 S.Ct. 2257. In this case, it is undisputed that CBS has an anti-harassment policy, with which Hardage had familiarity. As a supervisor, he was responsible for reporting sexual harassment to the human resources department, and he understood that sexual harassment was prohibited. Thus, CBS fulfilled its duty to take preventive measures as a matter of law by adopting and promoting awareness of its anti-harassment policy.
*1186 In addition, however, CBS must have taken steps to correct Hardage’s particular situation promptly. See Kohler, 244 F.3d at 1181 (“The [reasonable care] prong of the affirmative defense also requires [the employer] to demonstrate that it exercised reasonable care to promptly correct sexually harassing behavior”); see also Montero, 192 F.3d at 862. After Hardage complained to Dean in October 2000, Dean immediately contacted Rajewski, who in turn notified Falcone. Falcone called Hardage the same day he made his complaint, and shortly thereafter, they met in Seattle. At their meeting, Falcone discussed Hardage’s options. Hardage asserted that he wanted to “handle it by [him]self.” Approximately two weeks later, Falcone followed up with Hardage by telephone, and Hardage indicated that he still did not want Falcone to intervene. This would appear to end any debate on this issue, but Hardage makes two arguments as to why there is a triable factual dispute regarding this requirement.
First, he emphasizes Falcone’s “inexpli-cabl[e]” failure to investigate his complaint or discipline Sparks. In Swenson v. Potter, 271 F.3d 1184 (9th Cir.2001), we explained that “[n]otice of the sexually harassing conduct triggers an employer’s duty to take prompt corrective action that is ‘reasonably calculated to end the harassment.’ ” Id. at 1192 (citations omitted). “The reasonableness of the remedy depends on its ability to: (1) ‘stop harassment by the person who engaged in harassment;’ and (2) ‘persuade potential harassers to refrain from unlawful conduct.’ ” Nichols, 256 F.3d at 875. Although an “investigation is a key step,” Swenson, 271 F.3d at 1193, we “consider the overall picture” to determine whether the employer’s response was appropriate. Id. at 1197.
To be sure, CBS’s anti-harassment policy states that “[following a complaint, a thorough investigation will be made” and the “matter will be handled in the strictest of confidence.” Hardage was convinced, however, that there was “absolutely no way that [his complaint] could be handled anonymously,” and he therefore told Fal-cone he wanted to handle the situation by himself. Indeed, he stated that when Sparks later mentioned the words “sexual harassment” to him, he “felt like [his] trust had been possibly violated by corporate and-—leaking information, because [he had] stated [he] wanted to handle the case on [his] own.”
In addition, although Hardage did put CBS on notice of Sparks’ “unwanted sexual advances,” he did not tell Falcone the “gory details” or apprise Dean of the “specifics about sexual contact.” Instead, he was vague about the extent and nature of Sparks’ advances. Thus, even if a more thorough investigation and disciplinary measures for the harasser could in some circumstances be essential in spite of a harassed employee’s request to handle the situation, there can be no such duty in this case. See Ellison v. Brady, 924 F.2d 872, 882 (9th Cir.1991) (“[R]emedies should be ‘assessed proportionately to the seriousness of the offense’ ”); cf. Nichols, 256 F.3d at 870-71 (employer failed to meet remedial obligations after employee “reported and described the specifics of the harassment” to a human resources director, and “expressed concern that the harassment would continue to be ignored”). Dean’s alleged comment to Hardage that “Why don’t you just do it and get it over with. It may put her in a better mood” is certainly troubling. However, it cannot singularly serve to transform CBS’s response into an unreasonable one, nor can it erase the legal significance of his specific request not to investigate his admittedly minimal and vague complaint. Considering the “overall picture,” CBS’s *1187 response was both prompt and reasonable as a matter of law.[1]
Alternatively, Hardage contends there is a triable factual dispute as to whether CBS was on notice prior to his complaint to Dean in October of 2000. He alleges that he made “numerous complaints” to Dean and repeatedly told her he did not want to be left alone with Sparks. Yet when counsel for CBS asked Hardage during his deposition to state every time he could recall speaking to Dean about Sparks’ behavior, Hardage vaguely suggested a barbeque event and a concert at the Mercer Coliseum, but he could not remember the dates or what he told Dean about why he did not want to attend the events. Hardage recalled that he may have told Dean he did not want to be alone with Sparks—which Hardage asserts was “an ongoing joke”—but such a statement would hardly have given Dean notice of ongoing sexual harassment. Even drawing all reasonable inferences in favor of Hardage, these undetailed allegations are “merely colorable” and insignificantly probative to create a genuine factual dispute about whether CBS’s response was reasonable. See Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505; see also McPherson v. City of Waukegan, 379 F.3d 430, 441 n. 7 (7th Cir.2004) (“ ‘When ... the only possible source of notice to the employer ... is the employee who is being harassed, she ean-not withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she . was being sexually harassed.’ ” (quoting Zimmerman v. Cook County Sheriffs Dep’t, 96 F.3d 1017, 1019 (7th Cir.1996))).
Hardage also argues that CBS was on notice of the harassment because Dean personally observed some of Sparks’ harassing behavior. Yet, Hardage has stated that Dean also witnessed “some flirtation,” and he concedes that the mutual “banter” between Sparks and him could have been perceived as flirtatious. Taken in context, Dean did not unreasonably fail to report the incident to CBS management, thereby triggering CBS’s duty to remedy the situation promptly.
In addition, Hardage suggests Dean “had the opportunity to observe the harassment on a daily basis in the workplace.” However, until July 2001—ap-proximately ten months after Hardage complained to Dean in October 2000— Hardage worked in Seattle and Sparks worked in Tacoma. Accordingly, Dean had limited opportunities to observe Hard-age and Sparks together. Furthermore, given Hardage’s playful names for Sparks such as “Sparkalicious” and their “playful banter from the git-go,” his repeated invi *1188 tations to Sparks to socialize with him outside of work, and his failure to inform Dean that Sparks’ flirtations were unwelcome harassment, Dean did not unreasonably fail to report any flirtatious behavior by Sparks when she was visiting the Seattle office.
C.
We now turn to the third Ellerth/Faragher requirement: that Hard-age unreasonably failed to take advantage of preventive or corrective opportunities. As a local sales manager in charge of supervising approximately ten employees, Hardage was well aware of CBS’s anti-harassment policy and the procedure for initiating a complaint. Indeed, he testified he understood that “all actual sexual harassment in [his] workplace [was] dealt with in a serious manner.” He contends that he “informally and formally reported the harassment on several occasions,” and therefore he did not unreasonably fail to make use of remedial and preventive opportunities.
Yet, although Hardage contends the harassment commenced in April 2000, his first complaint to Dean that he has identified with specificity was in October 2000— approximately half a year later. “[W]hile proof that an employee failed to fulfill the ... obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer’s burden under [this] element of the defense.” Ellerth, 524 U.S. at 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807-08, 118 S.Ct. 2275; see also Suders, 124 S.Ct. at 2354 (the Ellerbh/Faragher defense requires “plaintiffs reasonably to stave off avoidable harm”); Kohler, 244 F.3d at 1181-82. In addition to waiting half a year to make a complaint, when Hardage finally made his complaint he specifically asked the company not to investigate it. By specifically requesting the company not make use of its remedial and preventative procedures, Hardage unreasonably failed to make use of CBS’s anti-harassment policies and procedures.
Thus, Hardage has failed to establish a material factual dispute regarding any of the three elements of CBS’s affirmative defense. The distinct court properly entered summary judgment for CBS and denied partial summary judgment for Hardage on his sexual harassment claim.
IV.
Title VII prohibits retaliation against an employee for opposing unlawful discrimination. 42 U.S.C. § 2000e-3(a). To make out a prima facie case of retaliation, Hardage must show that (1) he engaged in a protected activity, such as the filing of a complaint alleging sexual harassment; (2) CBS subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. See Manatt, 339 F.3d at 800, quoting Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir.2000); Brooks, 229 F.3d at 928. If Hardage makes a prima facie case, the burden shifts to CBS to articulate a legitimate, nondiscriminatory reason for the adverse action, and Hardage then bears the ultimate burden of demonstrating that this reason is pretextual. Manatt, 339 F.3d at 800.
Hardage contends he was subjected to retaliation in the form of adverse performance memoranda and being placed on a thirty-day probation period. In Ray, we recognized that “undeserved performance ratings, if proven, would constitute ‘adverse employment decisions.’ ” 217 F.3d at 1241 (emphasis added), quoting Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.1987). Here, by contrast, it is undisputed that Hardage failed to meet *1189 sales goals and disobeyed Dean’s instruction that he return to work after a charity event. Hardage therefore failed to prove a causal link between the memoranda and Hardage’s sexual harassment complaint. Furthermore, even if we assume that Hardage has established a prima facie case, we conclude he has failed to rebut CBS’s legitimate reasons for the memo-randa. See Manatt, 339 F.3d at 801. Moreover, except for the August 6 memorandum addressing Hardage’s insubordination, Stauffer received the same performance memoranda. “Absent a showing of disparate treatment, the [employer’s action] cannot be deemed retaliatory.” Brooks, 229 F.3d at 929.
In addition, Hardage asserts that Sparks retaliated by making “snide remarks” and threats, such as “your number’s up” and “don’t forget who got you where you are.” However, we have held that “only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation.” In Kortan v. California Youth Authority, 217 F.3d 1104, 1112 (9th Cir.2000), we held that a supervisor’s laughing and stating that the plaintiff “got him on sexual harassment charges,” the supervisor’s hostile stares, and increased criticism were insufficient to preclude summary judgment dismissing the plaintiffs retaliation claim. See also Brooks, 229 F.3d at 929 (stating that badmouthing an employee outside the job reference context does not constitute adverse employment action); Manatt, 339 F.3d at 803 (“Mere ostracism in the workplace is not grounds for a retaliation claim cf. Ray, 217 F.3d at 1243 (definition of “adverse employment action” “does not cover every offensive utterance by coworkers, because offensive statements by co-workers do not reasonably deter employees from engaging in protected activity”).
Moreover, even if Sparks’ remarks collectively created a hostile work environment that constituted retaliation, such harassment “is actionable only if it is ‘sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.’ ” Ray, 217 F.3d at 1245. quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Considering the totality of circumstances, we hold that Sparks’ comments are insufficiently severe to support a retaliation claim. See Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (“ ‘[S]imple teasing,’ offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ‘terms and conditions of employment.’ ” (citation omitted)).
V.
Because Hardage appeals from the district court’s dismissal of his state WLAD claims against Sparks only by arguing they should be reinstated if summary judgment for CBS is reversed, we affirm the district court’s dismissal of this claim as well. See 28 U.S.C. § 1367(c); Acri v. Varían Assocs., Inc., 114 F.3d 999, 1001 (9th Cir.1997) (en banc) (“ ‘[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims’ ” (omission in original) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988))).
AFFIRMED.

. The dissent accuses us of "depart[ing] from well-settled case law requiring an employer to conduct an investigation and take prompt corrective action once it is on notice of alleged harassment.” This "well-settled case law” appears to consist of a single out-of-circuit case, Malik v. Carrier Corp., 202 F.3d 97 (2d Cir.2000). Malik, however, addressed a significantly different legal context.
In Malik, the Second Circuit considered state law claims by a man accused of harassment. Malik filed suit for negligent infliction of emotional distress and negligent misrepresentation arising out of the investigation of complaints against him. 202 F.3d at 99. Malik’s accusers never requested that their complaints not be investigated. See id. at 100-02. Thus Malik bears little resemblance to the present action and the quoted language is at best dicta from another circuit.
There is thus no precedent to support the dissent's claim (at 1192) that “even if a complainant requests that the employer take no action, an employer still must fulfill its duty” to investigate the complaint. It is therefore the dissent that would "depart from well-settled” precedent by requiring an investigation in all circumstances no matter how strenuously or repeatedly the alleged victim asked the company to forego investigation.