**DRILL MASTERS–ELDORADO TOOL, INC., and Drill Masters Realty, LLC, Plaintiffs,**

v.

**PCC SPECIALTY PRODUCTS, INC., Defendant.**

**PCC Specialty Products, Inc., Plaintiff,**

v.

**Thomas J. Hall, and John Hall, Defendants.**

**Civil Nos. 3:08–cv–01733(AWT), 3:09–cv–00221(AWT).**

United States District Court, D. Connecticut.

Signed Sept. 30, 2014.

Eric J. Stockman, Robert Thomas Gradoville, Simon I. Allentuch, Neubert, Pepe & Monteith, P.C., New Haven, CT, for Plaintiffs.

Joel A. Mullin, Reilley D. Keating, Stoel Rivers LLP, Portland, OR, Steven I. Frenkel, Cummings & Lockwood, Stamford, CT, for Defendants.

### RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

ALVIN W. THOMPSON, District Judge.

These consolidated cases, *Drill Masters Eldorado Tool Inc., et al. v. PCC Specialty* Products Inc., ("*Drill Masters v. PCC*"), and *PCC Specialty Products, Inc. v. Thomas J. Hall, et al.*, ("*PCC v. Hall*") arise out of the purchase of certain business assets pursuant to an asset purchase agreement and entered into by the parties in *Drill Masters v. PCC*.

In *Drill Masters v. PCC*, Drill Masters–Eldorado Tool, Inc. ("Drill Masters, Inc.") and Drill Masters Realty, LLC ("Drill Masters Realty") (collectively, "Drill Masters") filed a four-count Second Amended Complaint against PCC Specialty Products, Inc. ("PCC"). In Count One, Drill Masters asserts a claim for breach of an Asset Purchase Agreement, dated October 9, 2002, entered into by PCC, Drill Masters, Inc. and Drill Masters Realty (the "Asset Purchase Agreement"). In particular, Drill Masters claims that PCC failed to fulfill its obligations under the Asset Purchase Agreement to comply with the Connecticut Property Transfer Act, Conn. Gen.Stat. § 22a–134 *et seq.* (the "Transfer Act"), and to reimburse Drill Masters, Inc. for costs relating to the termination of PCC employees. In Count Two, Drill Masters asserts a claim for breach of the implied covenant of good faith and fair dealing. In Count Three, Drill Masters asserts a negligence claim based on PCC's alleged breach of a duty under the Asset Purchase Agreement to investigate, characterize, and remediate environmental contamination. In Count Four, Drill Masters asserts a claim under the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42–110a *et seq.* ("CUTPA").

PCC filed an Answer to the Second Amended Complaint and Amended Counterclaims. In its first counterclaim, PCC asserts a claim for breach of contract, alleging that Drill Masters failed to pay a $1,162,000 promissory note (the "Note") issued pursuant to the Asset Purchase

Agreement, and continues to fail to pay interest on the Note. In its second counterclaim, PCC asserts a claim for a declaratory judgment under 28 U.S.C. § 2201, claiming that Drill Masters violated covenants that were incorporated by reference into the Asset Purchase Agreement by Amendment No. 1 to the Asset Purchase Agreement ("Amendment No. 1").

In *PCC v. Hall*, PCC brings two claims against defendants Thomas J. Hall and John Hall (collectively, the "Halls"). The Halls are co-owners and employees of Drill Masters; they were not parties to the Asset Purchase Agreement. The first claim is for tortious interference with contractual relations, and alleges that the Halls caused Drill Masters to breach covenants and contractual obligations to pay the Note. In the second claim, PCC asserts that the Halls were unjustly enriched by receipt and use of funds that should have been used to pay the Note.

In its motion for partial summary judgment, PCC has moved for summary judgment with respect to all claims and counterclaims except for (i) the terms of an Environmental Land Use Restriction that may be placed on the property pursuant to the Asset Purchase Agreement and (ii) PCC's claims against the Halls. In their motion for summary judgment, Drill Masters, Thomas Hall and John Hall have moved for summary judgment with respect to all claims and counterclaims "except for [Drill Masters'] claim that it lost a sale because [PCC] failed to timely investigate the contamination at the Drill Masters Building." (Motion for Summary Judgment (Doc. No. 115)). For the reasons set forth below, PCC's motion for summary judgment is being granted in part and denied in part, and Drill Masters' and the Halls' motion for summary judgment is being denied.

## I. FACTUAL BACKGROUND

On October 9, 2002, Drill Masters and PCC entered into the Asset Purchase Agreement. The Asset Purchase Agreement provided for, among other things, the sale of certain assets of PCC's former Eldorado Tool division (the "Tooling Business") to Drill Masters. Included in these assets was real property located at 336 Boston Post Road, Milford, Connecticut (the "Property"). The Property is a 4.6–acre site that includes a building (the "Building") that is approximately 67,900 square feet. The Building has been occupied by a machine and tool manufacturer since some time in the mid–20th century. The area where the Property is located is populated by commercial businesses, as well as residential properties. Billberry Swamp, which is owned by the City of Milford, is located nearby the Property.

In the Asset Purchase Agreement, PCC agreed that, to its knowledge, the Transfer Act applied to the transaction. Drill Masters and PCC further agreed that PCC would be the "certifying party" under the Transfer Act and that PCC:

shall, at its sole cost and expense, conduct and complete the investigation, remediation, and monitoring of the Premises including the operation and maintenance of remediation systems (collectively referred to as "Environmental Work") in accordance with the Remediation Standard Regulations, § 22a–133k–1 through –3 of the Regulations of Connecticut State Agencies. [PCC] shall not impose an environmental land use restriction ("ELUR") on the Premises until and unless [Drill Masters Realty] has given its written approval of such ELUR, which approval shall not be unreasonably withheld or delayed. [PCC] shall perform the necessary Environmental Work in order to receive either a final written approval from the

Commissioner of the DEP or, if the Environmental Work may be verified by a Licensed Environmental Professional ("LEP"), a final written verification from a LEP for the investigation and remedial actions taken.

(Asset Purchase Agreement (Doc. No. 113–3, Ex. 3) § 7.4(a).)

PCC and Drill Masters each have had experts investigate environmental contamination at the Property and at Billberry Swamp. The investigations have revealed polychlorinated biphenyl ("PCB") in soil on the Property (including under the Building and outside its footprint), in the Building's concrete floor, and in sediment from Billberry Swamp. PCB levels higher than 1ppm were identified in samples from each of these locations, and PCC acknowledges that PCBs are present in concentrations greater than 10ppm below the concrete floor. The parties dispute whether PCC fully investigated and characterized the Property on a timely basis, although Drill Masters acknowledges that characterization of the soils at the Property is now complete. The parties also dispute whether the PCB contamination at Billberry Swamp is covered by the Asset Purchase Agreement and whether such contamination has been fully characterized. On the other hand, the parties agree that PCC has not completed remediation of the Property.

The Asset Purchase Agreement provides that PCC would "not impose an environmental land use restriction ('ELUR') on the Premises until and unless [Drill Masters Realty] has given its written approval of such ELUR, which approval shall not be unreasonably withheld or delayed." (Asset Purchase Agreement § 7.4(a).) In June 2006, PCC proposed to Drill Masters an ELUR that would isolate PCBs below the Building floor. Discussions about the ELUR occurred from 2006 to 2008. Ulti-

mately, Drill Masters did not approve the proposed ELUR. PCC contends that Drill Masters rejected the ELUR because Drill Masters hoped to sell the Property to a developer of a Big Y supermarket, who opposed the ELUR because the developer planned to demolish the Building, break up the concrete floor, and re-grade the property. Drill Masters, on the other hand, implies that the ELUR was rejected because the site was not eligible for an ELUR, at least until a few months before September 2011, due to the fact that the contamination there had not been fully characterized.

In the Asset Purchase Agreement, the parties recognized that there would be certain post-closing costs with respect to former employees of PCC's Tooling Business, the assets of which were being sold to Drill Masters. PCC agreed to terminate all then-current employees of the Tooling Business as of the closing date. PCC agreed that it would "be responsible for all costs and expenses that may arise out of or in connection with the termination of such terminated" employees and for compliance with health care continuation requirements for certain group health plans. (Asset Purchase Agreement § 11.2.) PCC further agreed to certain indemnity provisions in favor of Drill Masters with respect to former employees of the Tooling Business; it agreed that PCC would be liable for losses, liabilities, assessments and taxes relating to employees and employee benefit plans with respect to periods prior to the closing date. Drill Masters, Inc. agreed to assume, pay, perform, and discharge Tooling Business liabilities on and after the closing date.

PCC terminated Tooling Business employees on the closing date. After the closing date, Drill Masters, Inc. did not hire all the Tooling Business employees who had been terminated by PCC. The

former Tooling Business employees who were not hired by Drill Masters, Inc. were eligible for unemployment benefits accruing in the post-closing period. Subsequently, the Connecticut Department of Labor ("DOL") determined that Drill Masters, Inc. was the full successor of the Tooling Business for purposes of employment issues under the DOL's jurisdiction, and also that Drill Masters, Inc. had underpaid its unemployment contributions during the post-closing period. Thus, DOL required Drill Masters, Inc. to pay the unpaid unemployment compensation expenses accrued after the closing.

In November 2002, Drill Masters and PCC entered into several additional agreements in connection with the Asset Purchase Agreement. On November 7, 2002, Drill Masters and PCC entered into Amendment No. 1. Among other things, Amendment No. 1 specifies that the purchase price would be $4,700,000, of which $1,500,000 was allocated to the sale of real property. Amendment No. 1 includes certain debt-related covenants and restrictions on Drill Masters.

On November 15, 2002, Drill Masters executed the Note pursuant to the Asset Purchase Agreement and Amendment No. 1. The Note required Drill Masters to pay PCC $1,162,000, plus any accrued and unpaid interest, by November 15, 2004. However, if on that date (i) Drill Masters owed People's Bank more than $1,500,000 pursuant to a Commercial Loan Agreement between Drill Masters, Inc. and People's Bank dated as of November 15, 2012 (the "Commercial Loan Agreement"), or (ii) Drill Masters, Inc. did not meet the Debt Service Coverage Ratio provided for in the Commercial Loan Agreement, then payment was not due until the first business day on which both of those conditions were no longer in existence.

As of November 15, 2002, PCC, Drill Masters and People's Bank entered into a subordination agreement (the "Subordination Agreement"). Pursuant to the Subordination Agreement, the Note is subordinated to People's Bank's rights in connection with the Commercial Loan Agreement. In the Subordination Agreement, PCC agreed to "not take or omit to take any action or assert any claim with respect to the Subordinated Debt or otherwise which is inconsistent with the provisions of" the Subordination Agreement, provided that no "Event of Default" has occurred. (Subordination Agreement (Doc. No. 113–3, Ex. 4) § 3.) "Event of Default" is defined in the Commercial Loan Agreement. The Subordination Agreement also gives Drill Masters the right to "restrain the enforcement" of the Note pursuant to the terms of the Subordination Agreement. (Subordination Agreement § 5.)

Additionally, Drill Masters and PCC caused to be delivered to People's Bank a $3,680,000 irrevocable letter of credit in connection with an Environmental Indemnity Agreement between PCC and People's Bank (the "Environmental Indemnity Agreement"). In the Environmental Indemnity Agreement, PCC acknowledged its environmental obligations under the Asset Purchase Agreement and that the letter of credit was intended to provide security for those obligations.

PCC contends that Drill Masters breached certain covenants it made in Amendment No. 1. From 2003 through 2006, Drill Masters exceeded the annual capital expenditure limit agreed to in Amendment No. 1 without the prior approval of PCC. Drill Masters also exceeded the annual salary cap for the Halls without the prior approval of PCC. In addition, Drill Masters, Inc. paid Drill Masters Re-

alty rent in excess of the amount it was allowed to pay.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990)). However, the inferences drawn in favor of the non-movant must be supported by evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir.1997) (quoting *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. DISCUSSION

### A. *Breach of Contract—Unemployment Insurance*

PCC and Drill Masters each have moved for summary judgment with respect to Drill Masters' claim that PCC breached the Asset Purchase Agreement by failing to reimburse Drill Masters for post-closing unemployment insurance costs.

#### 1. *Machine Business Employees*

PCC has moved for summary judgment with respect to Drill Masters' claim for breach of contract to the extent Drill Masters asserts a claim for post-closing costs related to former Machine Business, rather than Tooling Business, employees.

Drill Masters has agreed that "[t]his obligation is limited to Tooling Employees." (Drill Masters' Mem. Supp. Mot. Summ. J. (Doc. No. 127) at 17.) Therefore, PCC's motion for summary judgment is being granted in this respect.

### 2. Tooling Business Employees

Drill Masters and PCC have each moved for summary judgment with respect to Drill Maters' breach of contract claim to the extent it concerns post-closing costs related to Tooling Business employees.

PCC makes two arguments. First, PCC argues that Drill Masters' claim is barred because it failed to promptly notify PCC of the legal proceeding with DOL. Second, PCC argues that it was not liable for post-closing unemployment insurance costs under § 11 of the Asset Purchase Agreement. Drill Masters did not address either of these arguments in its opposition to PCC's motion for summary judgment. PCC reiterated these arguments in its opposition to Drill Masters' motion for summary judgment on this issue, but Drill Masters did not respond to PCC's arguments in its reply.

Because Drill Masters did not respond to PCC's motion for summary judgment as to this claim (or respond to PCC's arguments in opposition to Drill Masters' motion for summary judgment on the claim), the court deems the claim abandoned by Drill Masters. *See Carone v. Mascolo*, 573 F.Supp.2d 575, 591 (D.Conn.2008) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (quoting *Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003); citing *Bronx Chrysler*

*Plymouth, Inc. v. Chrysler Corp.*, 212 F.Supp.2d 233, 249 (S.D.N.Y.2002) (dismissing claim as abandoned because plaintiff's summary judgment opposition papers made no argument in support of the claim)).

Therefore, PCC's motion for summary judgment is being granted as to this issue, and Drill Masters' is being denied.

### B. Breach of Contract—Environmental Issues

Drill Masters and PCC each have moved for partial summary judgment with respect to the claim by Drill Masters that PCC breached its obligations under the Asset Purchase Agreement related to environmental issues.[1]

█ PCC acknowledges that it is obligated by the Asset Purchase Agreement to satisfy the requirements of the Transfer Act in accordance with the regulations promulgated under it, i.e., the Remediation Standard Regulations, Conn. Agencies Regs. § 22a–133k–1 through –3 (the "RSRs"). "When there is a sale of real property that may be environmentally contaminated, the [Transfer Act] requires a transferor either to provide to a transferee a negative declaration to indicate that the property poses no environmental threat or to certify to the [D]epartment of [E]nvironmental [P]rotection that remediation measures will be undertaken." *Visconti v. Pepper Partners Ltd. P'ship*, 77 Conn.App. 675, 676, 825 A.2d 210 (2003).

### 1. The Toxic Substances Control Act

PCC has moved for summary judgment on Drill Masters' claim that PCC has an obligation under the Asset Purchase Agreement to comply with the Toxic Sub-

---

1. Drill Masters did not move for summary judgment on this claim to the extent it concerns Drill Masters' alleged lost sale due to PCC's failure to timely investigate environmental contamination.

stances Control Act, 15 U.S.C. § 2601 *et seq.* ("TSCA"), and the regulations promulgated under it, to the extent that Drill Masters made such a claim. PCC makes two arguments for summary judgment on this claim. First, PCC argues that any claim based on compliance with TSCA would be time–barred under § 12.4(c) of the Asset Purchase Agreement. Second, PCC contends that the Asset Purchase Agreement does not require compliance with TSCA directly, but rather only to the extent that the Transfer Act and RSRs require compliance with TSCA or federal regulations promulgated under TSCA. In its opposition to PCC's motion for summary judgment, Drill Masters does not argue that PCC has any obligations directly under TSCA. Therefore, to the extent Drill Masters claimed that PCC violated obligations directly under TSCA, the court deems that claim abandoned. *See Carone v. Mascolo,* 573 F.Supp.2d at 591

In any event, the court agrees with PCC that any claim that PCC breached the Asset Purchase Agreement by failing to meet requirements directly under TSCA is time-barred. The Asset Purchase Agreement only explicitly mentions TSCA in § 5.16(j). Section 12.4(c) of the Asset Purchase Agreement provides that "representations and warranties made with respect to environmental matters (*Section 5.16*) shall survive for a period of five (5) years after the Closing Date. . . ." (Asset Purchase Agreement § 12.4(c).) The Closing Date was November 15, 2002. Thus, any TSCA-based breach of contract claim would have expired on November 15, 2007, and Drill Masters did not file its initial complaint in this case until November 14, 2008.

Therefore, PCC's motion for summary judgment as to Drill Masters' claim that PCC has an obligation to comply with TSCA is being granted.

### 2. Other Environmental Claims

Drill Masters and/or PCC have moved for summary judgment with respect to a number of other environmental claims: (1) Drill Masters has moved for summary judgment on its claim that PCC breached its obligation under the Asset Purchase Agreement to investigate environmental contamination at the Property; (2) Drill Masters and PCC have each moved for summary judgment with respect to Drill Masters' claim that PCC breached its obligation under the Asset Purchase Agreement to remediate the Property under the Transfer Act in accordance with the RSRs; (3) Drill Masters has moved for summary judgment on its claim for fees incurred for investigation into contamination of the concrete floor; and (4) Drill Masters has moved for summary judgment on its breach of contract claim relating to PCC's alleged failure to fully investigate and remediate Billberry Swamp.

The parties have advised the court that a remediation plan for the Property has been submitted to the Connecticut Department of Energy and Environmental Protection, which will take formal agency action. In addition, the parties have requested that the court not issue a ruling on the above-described environmental claims at this time. Therefore, Drill Masters' motion summary judgment being denied without prejudice as to the issues of the investigation and characterization of the Property, remediation under the Transfer Act in accordance with the RSRs, investigation of the concrete floor and investigation and remediation of Billberry Swamp, and PCC's motion for summary judgment is being denied without prejudice with respect to remediation under the Transfer Act in accordance with the RSRs.

### C. *Consequential Damages*

■ With respect to Drill Masters' breach of contract claim, PCC has moved for summary judgment to the extent that the claim seeks damages for changes in the value of the Property.

To recover consequential damages, the plaintiffs must prove causation, certainty, and foreseeability; specifically, the damages plaintiff suffered must "be such as may reasonably be supposed to have been in the contemplation" of the parties at the time they made the contract as a potential consequence if the defendant breached the contract. *City of Milford v. Coppola Constr. Co., Inc.,* [93 Conn. App. 704] 891 A.2d 31, 39 (Conn.App.Ct. 2006); *see Boulevard Assocs. v. Sovereign Hotels, Inc.,* 861 F.Supp. 1132, 1136 (D.Conn.1994).

*Ryan v. Nat'l Union Fire Ins.,* No. 3:03–CV–0644 CFD, 2010 WL 3925208 at \*2 (D.Conn. Sept. 28, 2010). There exist genuine issues of material fact with respect to the causal link between PCC's failure to complete remediation of the Property and any decrease in value of the Property, as well as with respect to the foreseeability of such a decrease in value. Therefore, PCC's motion for summary judgment is being denied as to this issue.

### D. *Exclusive Remedy Clause and Liability Cap*

■ PCC has moved for summary judgment with respect to Drill Masters' claims for breach of the implied covenant of good faith and fair dealing, negligence, and violation of CUTPA on the ground that those claims are precluded by § 12.7 of the Asset Purchase Agreement, which provides:

The exclusive remedy available to a party hereto in respect to the matters covered by *Section 12.1* or *Section 12.2* shall be to proceed in the manner and subject to the limitations contained in this *Article 12.*

Asset Purchase Agreement § 12.7 (emphasis in original). PCC has moved in the alternative for a ruling that the $3,000,000 cap on liability in § 12.3 applies to all damages sought in the four counts in Drill Masters' amended complaint against PCC (i.e., breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, and violation of CUTPA) to the extent the claims relate to PCC's environmental obligations.

Article 12 of the Asset Purchase Agreement deals with "Indemnification and Related Matters," but principally with indemnification. Section 12.3 refers to §§ 12.1 and 12.2. Section 12.1, which is pertinent here, contains provisions with respect to indemnification by the "Seller," which is PCC, and § 12.2 contains provisions with respect to indemnification by the "Purchasers," which is Drill Masters.

A number of other provisions of the Asset Purchase Agreement are pertinent to construing the meaning of § 12.7 and § 12.3. Article 5 of the Asset Purchase Agreement contains certain representations and warranties by the "Seller" to the "Purchasers." Section 5.16 sets forth representations and warranties with respect to environmental matters. Article 6 contains representations and warranties of Drill Masters, as the "Purchasers." Article 7 contains covenants of PCC, as the "Seller." Section 7.4 contains, in subsection (a) PCC's covenant with respect to the Transfer Act; subsection (b) contains PCC's covenant with respect to underground storage tanks; and subsection (c) contains PCC's covenant with respect to removal of stained soil and asbestos that is referred to in a disclosure schedule to the Asset Purchase Agreement.

Section 12.1, which is referenced in § 12.7, provides as follows:

*Indemnification by Seller.* Subject to the provisions of this *Article 12,* Seller agrees to indemnify and hold Purchasers and any assignees permitted under *Section 15.2* harmless from and against:

(a) any and all liabilities, obligations, damages and expenses resulting from the failure of any of the representations and warranties of Seller contained in this Agreement to have been true in all respects when made and as of the Closing Date, except for such representations and warranties made as of a specified date, with respect to which this *Section 12.1(a)* shall apply only to the failure of such representations and warranties to have been true in all respects as of such specified date;

(b) any and all liabilities, obligations, damages and expenses resulting from the failure of Seller to comply in all respects with any of the covenants contained in this Agreement which are required to be performed by Seller, except for the covenants set forth in *Article 11* with respect to employee benefits, as to which the indemnifications provided in *Article 11* shall be exclusive;

(c) any and all debts, claims, liabilities, obligations, damages and expenses not assumed by DMI pursuant to *Section 2.4* of this Agreement; and

(d) all actions, suits, proceedings, costs and expenses, including reasonable attorneys' fees, incident to the foregoing.

Asset Purchase Agreement § 12.1 (emphasis in original).[2] Section 12.3 provides as follows:

*Limitation on Indemnification Liabilities.*

(a) *Indemnity Claims.* The liability of Seller to DMI and LLC for breach of warranty or for indemnification obligations hereunder shall not exceed Three Million Dollars ($3,000,000) in the aggregate.

(b) *Indemnity Claims Related to Seller's Breach of Representation and Warranty.* Subject to *Section 12.3(a)* hereof and except for Seller's obligations under Section 7.4 hereof, the indemnifications in favor of Purchasers contained in *Section 12.1,* with respect to matters related to losses, liabilities, damages or expenses (including reasonable attorney's fees) resulting from breach of Seller's representations or warranties set forth in *Article 5,* shall not be effective until the aggregate dollar amount of such losses, liabilities, damages or expenses indemnified against under such Sections exceeds One Hundred Thousand Dollars ($100,000) in the aggregate, and then shall be effective only as to amounts

**2.** The provisions of Section 12.2 are somewhat parallel to those of Section 12.1. Of particular significance are the following provisions:

*Indemnification by Purchasers.* Subject to the provisions of this Article 12, Purchasers agree jointly and severally to indemnify and hold Seller and any assignee permitted under *Section 15.2,* harmless from and against:

(a) any and all liabilities, obligations, damages and expenses resulting from the failure of any of the representations and warranties of Purchasers contained in this Agreement to have been true in all respects when made and as of the Closing Date;

(b) any and all liabilities, obligations, damages and expenses resulting from the failure of Purchasers to comply in all respects with any of the covenants contained in this Agreement which are required to be performed by Purchasers;

. . .

Asset Purchase Agreement § 12.2.

in excess of the One Hundred Thousand Dollars ($100,000) threshold....

Asset Purchase Agreement § 12.3 (emphasis in original).

Section 12.4 addresses survival of representations, warranties and covenants and specifically provides that representations and warranties made with respect to environmental matters in § 5.16 survive for a period of five years after the closing date, and that all other "representations, warranties and covenants made pursuant to this Agreement, except Section 7.4(a), shall survive for a period of two (2) years after the Closing Date." Asset Purchase Agreement § 12.4(d). Subsection (e) provides that:

all covenants, representations, or warranties made with respect to the Transfer Act (Section 7.4(a)), shall, to the extent applicable, survive until the earlier of: (i) written approval from the DEP that the Real Property has been investigated and remediated in accordance with the RSRs; (ii) completion of an audit by the DEP confirming that a "verification" as defined in Conn. General Statutes § 22a–134(19) is appropriate for the Real Property; or (iii) two years after a "verification" for the Real Property has been submitted to, but not indicated in writing to be deficient by, the DEP.

Asset Purchase Agreement § 12.4(e).

Section 12.5 contains requirements with respect to notice by the party seeking indemnification to the indemnitor that a legal proceeding has been threatened or instituted or that a claim or demand has been asserted. It reads as follows:

*Notice of Indemnification.* In the event any legal proceeding shall be threatened or instituted or any claim or demand shall be asserted by any Person in respect of which indemnification may be sought by one party hereto from the other party under the provisions of this *Article 12,* the party seeking indemnification (the "Indemnitee") shall promptly cause written notice of the assertion of any such claim of which it has knowledge which is covered by this indemnity to be forwarded to the other party (the "Indemnitor"), which notice must be received by the Indemnitor prior to the expiration of applicable period of indemnification after the Closing Date set forth in *Section 12.4* hereof. Any notice of a claim by reason of any of the representations, warranties, or covenants contained in this Agreement shall state specifically the representation, warranty or covenant with respect to which the claim is made if then determinable, the facts giving rise to an alleged basis for the claim, and a reasonable estimate of the amount of the liability asserted against the Indemnitor by reason of the claim.

Asset Purchase Agreement § 12.5. Section 12.6, "Indemnification Procedure for Third Party Claims," is triggered "in the event of the initiation of any legal proceeding against an Indemnitee by a third party...." Asset Purchase Agreement § 12.6.

With respect to § 12.3, the provision referred to in its caption as setting forth a limitation on "indemnification liabilities," the plain language of § 12.3(a) expressly provides that the combination of PCC's liability for breach of warranty and for indemnification obligations shall not together exceed $3,000,000. Also, the plain language of § 12.1 expressly provides that PCC's indemnification liabilities include those for a failure of its representations and warranties to be true in all respects (*see* subsection (a)) and those resulting from breach of covenants contained in the Asset Purchase Agreement (excluding Article 11) (*see* subsection (b)). Thus §§ 12.1 and 12.3, read together, provide that

PCC's aggregate liability for breach of warranty and for indemnification with respect to untrue representations and warranties and breach of covenants (except those in Article 11), is capped at $3,000,000, subject to the carve out in § 12.3(b).

The precise meaning of the term "indemnification," under Connecticut law, is material to the analysis of the provisions of the Asset Purchase Agreement at issue here. In *Amoco Oil Co. v. Liberty Auto and Electric Co.*, the Connecticut Supreme Court discussed the characteristics of a claim for indemnification, versus a claim for breach of contract:

> As a threshold matter, we must properly characterize Amoco's claim for "indemnification." Our analysis begins with the contract provision on which Amoco relies in asserting its claim in count one of its complaint. Among other things, that provision purports to require Liberty to *reimburse* Amoco for and *indemnify* Amoco against loss, costs, damage, expense, claims and liability arising out of work performed by Liberty under the contract. Count one of Amoco's complaint is based solely on damage to Amoco's property allegedly caused by Liberty's negligent and improper installation of the tank, not from losses that arise from Amoco's liability to a third party. Count one, therefore, is improperly characterized as a claim for indemnification; it is, rather, a claim for damages for Amoco's own losses. Although Amoco maintains that its claim arises under a provision of its contract with Liberty entitled "Liability and Indemnity," a claim for indemnity and a claim for one's first party losses are not one and the same.

262 Conn. 142, 148, 810 A.2d 259 (2002) (emphasis in original) (internal citation omitted).

In Connecticut, there are cases that are instructive when determining when an action to enforce an indemnity contract accrues. The logic and rationale underlying our indemnity case law are based on the premise that an action for indemnification is one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party. *Id.* The court also explained the distinction between agreements to indemnify against loss and agreements to indemnify against liability.

> In interpreting indemnity agreements, we frequently have distinguished between agreements that indemnify against loss and agreements that indemnify against liability. Both types of agreements, however, protect the indemnitee against claims asserted by third parties against the indemnitee. Generally, indemnity agreements fall broadly into two classes, those in which the contract is to indemnify against liability and those in which it is to indemnify against loss. In the first, the cause of action arises as soon as liability is incurred, but in the second it does not arise until the indemnitee has actually incurred the loss. When an indemnity agreement, however, indemnifies against liability as well as against loss the indemnitee does not have to wait until the loss occurs, but may sue on the agreement as soon as liability is incurred.

*Id.* at 149, 810 A.2d 259 (internal quotation marks omitted). "Finally, [the Connecticut Supreme Court] also ha[s] acknowledged that some indemnification agreements constitute agreements to indemnify against both loss and liability." *Id.* at 150, 810 A.2d 259.

■ Here only one paragraph of Drill Masters' Second Amended Complaint states that Drill Masters seeks indemni-

fication with respect to environmental issues. Paragraphs 50 and 51 seek reimbursement, but with respect to costs associated with termination of PCC's employees, which is covered by Article 11 of the Asset Purchase Agreement. In paragraph 49 Drill Masters alleges that PCC "has failed to reimburse Drill Masters and Drill Masters Realty for costs associated with waste removal and investigation of the Building, it was forced to incur in violation of the [Asset Purchase] Agreement." (Drill Masters' Second Am. Compl. (Doc. No. 37) ¶ 49). There are other claims in the Second Amended Complaint for damages which are not stated in terms of reimbursement, i.e. indemnification. There is no claim that is expressly described as arising out of a breach of warranty.

Thus, to the extent that a claim is one for damages for Drill Masters' own losses (as opposed to losses that arise from Drill Masters' liability to a third party) and does not flow from a breach of warranty, that claim is not subject to the $3,000,000 cap on liability in § 12.3 of the Asset Purchase Agreement.

Section 12.3(a) could have been, but was not, written to provide that PCC's total liability for breach of warranty, breach of covenant, indemnification obligations and any other obligation in connection with or arising out of the Asset Purchase Agree-· ment would not exceed $3,000,000. Instead the provisions of Article 12 reflect that the parties chose at certain times to reference "representations and warranties," at certain times to reference "representations, warranties and covenants" and at other times to reference "covenants" or "breach of warranty."

With respect to § 12.7 of the Asset Purchase Agreement, the exclusive remedy provision, that section provides an exclusive remedy to a party "in respect to mat-

ters covered by *Section 12.1* or *Section 12.2* " and the party is required to proceed "in the manner and subject to the limitations contained in ... *Article 12*." (Asset Purchase Agreement § 12.7 (emphasis in original).) The matters covered by §§ 12.1 and 12.2 are claims for indemnification, not claims for other than indemnification. This understanding of §§ 12.1, 12.2 and 12.3 is consistent with the provisions in §§ 12.5 and 12.6 which relate to notice by the party seeking indemnification to the indemnitor that a legal proceeding has been threatened or instituted or a claim or demand has been asserted, and to an indemnification procedure for claims by third parties. Thus, to the extent that a claim is not a claim for indemnification, it does not fall within the provisions of § 12.7.

PCC argues that while the breach of contract claim is not barred by the exclusive remedy provision, the other claims in the amended complaint are. However, the focus of § 12.1 and § 12.2 is on liabilities, obligations, damages and expenses resulting from certain failures of PCC or Drill Masters. The focus is not on the causes of action the injured party may bring. Thus while PCC cites *General Electric Co. v. Specialty Store Lighting, Inc.*, No. CV 9574939, 1996 WL 156010 (Conn.Super.Ct. Mar. 15, 1996), the court finds that case inapposite. There the court granted a motion to strike counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing and CUTPA based on a limitation of liability provision that provided:

> In no event, whether as a result of *breach of contract or warranty or alleged negligence or otherwise* shall either party be liable to the other for special or consequential damages including, but not limited to, loss of profits or revenue. . . .

*Id.* at *3 (emphasis added). The limitation of liability provision there spoke in terms of causes of action. There is no such language present here.

Therefore, PCC's motion for summary judgment is being denied with respect to its argument that Drill Masters' claims for breach of the implied covenant of good faith and fair dealing, negligence and violation of CUTPA are precluded by § 12.7 of the Asset Purchase Agreement, and also with respect to its argument that the $3,000,000 cap on liability in ¶ 12.3 applies to all damages sought by Drill Masters.

### E. *Breach of Implied Covenant of Good Faith and Fair Dealing*

■ Drill Masters has moved for summary judgment on its claim that PCC breached the implied covenant of good faith and fair dealing by "purposefully failing to timely and properly investigate and characterize and remediate the environmental contamination at the Building." Drill Masters' Second Am. Compl. ¶ 55. Under Connecticut law,

> every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . .
>
> To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than

mere negligence; it involves a dishonest purpose.

*De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 432–33, 849 A.2d 382 (2004) (internal quotation marks, citations, brackets, and ellipsis omitted).

> [W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 Samuel Williston & Richard Lord, A Treatise on the Law of Contracts § 63.22 (4th ed.2006)); *see also Habetz v. Condon,* 224 Conn. 231, 238 n. 11, 618 A.2d 501 (1992) ("It is the burden of the party asserting the lack of good faith to establish its existence and whether that burden has been satisfied in a particular case is a question of fact.").

There exist genuine issues of material fact as to whether PCC acted in bad faith. While Drill Masters asserts that "PCC has a dishonest purpose," that "PCC was unwilling to honor its obligations," and that "PCC acted in bad faith," (Drill Masters' Mem. Supp. Mot. Summ. J. at 24–25) it does not point to the specific evidentiary basis in the record that would prove these assertions.

Therefore, Drill Masters has not presented facts, let alone met its initial burden at the summary judgment stage, and its motion for summary judgment on its claim for breach of the implied covenant of good faith and fair dealing is being denied.

### F. *Negligence*

PCC has moved for summary judgment on Count Three of Drill Masters' Second Amended Complaint, and so has Drill Mas-

ters. PCC argues that the negligence claim in Count Three is actually a contract claim and cannot be converted into a tort claim.

In Count Three, Drill Masters reasserts the allegations made in its claims for breach of contract and breach of the implied covenant of good faith and fair dealing. (*See* Drill Masters' Second Am. Compl. ¶ 57). Drill Masters further alleges that *"[u]nder the [Asset Purchase] Agreement,* PCC had a duty to timely and properly investigate, characterize and remediate the environmental contamination at the Building. PCC breached its duty to plaintiffs by failing to do so, which failure continues to the date of the filing of this action." (Drill Masters' Second Am. Compl. ¶ 58 (emphasis added)).

■ The economic loss doctrine "limit[s] a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *State v. Lombardo Bros. Mason Contractors, Inc.,* 307 Conn. 412, 469 n. 41, 54 A.3d 1005 (2012) (quoting *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.,* 223 Ariz. 320, 323, 223 P.3d 664 (2010)).

> The Connecticut Supreme Court has said that in cases where "the liability of [the] defendant to the plaintiff, if any, is based on principles of tort law," then "the plaintiff may not convert that liability into one sounding in contract merely by talismanically invoking contract language in his complaint." *Mutatis mutandis,* [the plaintiff] may not convert [the defendant]'s contract liability into one sounding in tort merely by 'talismanically' phrasing its counts in terms of duties, breaches of those duties, causation, and injury.

*Air Brake Sys., Inc. v. TUV Rheinland of N. Am., Inc.,* 699 F.Supp.2d 462, 475–76 (D.Conn.2010) (internal brackets and cita-

tion omitted) (quoting *Gazo v. City of Stamford,* 255 Conn. 245, 262, 765 A.2d 505 (2001)). *See also Factory Mut. Ins. Co. v. Pike Co., Inc.,* No. 3:08–CV–01775(VLB), 2009 WL 1939799 at *3 (D.Conn. July 6, 2009) ("The complaint merely assigns the alternative label of negligence to Pike's alleged breach of contract. . . . Therefore, the Court concludes that Factory Mutual has not alleged sufficient facts and damages to maintain a separate negligence claim.").

■ Drill Masters' negligence claim is based on PCC's alleged duty under the Asset Purchase Agreement, so it is based on contract liability. Moreover, Drill Masters has claimed economic damages only as a result of PCC's alleged negligence. (*See* Drill Masters' Mem. Opp. Mot. Summ. J. (Doc. No. 141) at 38 ("Because of PCC's negligence, the PCBs that PCC had agreed to clean up[ ] remain at the site and have so damaged its *value* that the Drill Masters building is *worthless.*" (emphasis added)); Drill Masters' Mem. Supp. Mot. Summ. J. at 26 ("As a result [of PCC's negligence] the Drill Masters building is worth nothing.")). Thus, Drill Masters' negligence claim is barred by the economic loss doctrine.

Therefore, PCC's motion for summary judgment as to Drill Masters' negligence claim is being granted, and Drill Masters' motion for summary judgment is being denied.

## G. *CUTPA*

Drill Masters has moved for summary judgment on its CUTPA claim. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a).

■ In its opposition to Drill Masters' motion for summary judgment, PCC argues that the CUTPA claim fails as a matter of law. "[A] CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn.App. 486, 523, 890 A.2d 140 (2006) (concluding that the trial court properly directed a verdict in the defendants' favor because the sale of real property was "merely incidental" to the defendants' business of selling and servicing automobiles). *See also Biro v. Matz*, 132 Conn.App. 272, 289–90, 33 A.3d 742 (2011) ("Because the sellers in the present case are not in the business of selling real property, CUTPA is inapplicable to the transaction in this case."); *Landmark Inv. Grp., LLC v. Chung Family Realty P'ship, LLC*, 125 Conn.App. 678, 699–701, 10 A.3d 61 (2010) (holding that CUTPA applied to a sale of property where the defendant's articles of organization stated its purpose included acquiring and developing real property and the defendant had attempted to develop the subject property); *Sovereign Bank v. Licata*, 116 Conn.App. 483, 493–94, 977 A.2d 228 (2009) (holding there could be no CUTPA violation by a real estate acquisition business regarding a mortgage transaction because "[t]here was no evidence presented at trial that [the real estate business] ever had ... engaged in the mortgage business").

■ The Second Amended Complaint states that the basis for the CUTPA claim is PCC's alleged failure to "properly investigate and remediate contamination at the [Property]" and PCC's engaging in tactics that were and are "designed to force [Drill Masters] to accept the inadequate site investigation, characterization and remediation." (Drill Masters' Second Am. Compl. ¶ 63). There is no evidence that PCC was in the business of selling real property or investigating, characterizing or remediating environmental contamination. To the contrary, the record demonstrates that PCC was in the business of manufacturing machines and tools. (*See* Asset Purchase Agreement 1 (describing PCC as "engaged in the business of manufacturing 'gundrilling' (i) machines and sharpening fixtures ..., and (ii) tools and other related tooling products....")). Thus, the court concludes that the CUTPA claim against PCC fails as a matter of law. *See Sealy Conn., Inc. v. Litton Indus., Inc.*, 989 F.Supp. 120, 127 (D.Conn.1997) ("accept[ing] defendants' position that CUTPA does not encompass the handling of hazardous waste incident to a defendant's manufacturing operations" and, therefore, granting the defendants' motions to dismiss the CUTPA claim against them as the claim related to the handling of hazardous waste).

Therefore, Drill Masters' motion for summary judgment as to the CUTPA claim is being denied. Although PCC did not move for summary judgment on the CUTPA claim except on the ground that it is barred by the Asset Purchase Agreement's exclusive remedy provision, because both sides have briefed the issue and the court has concluded that Drill Masters' CUTPA claim fails as a matter of law, judgment will be entered in favor of PCC on the CUTPA claim.

### H. *Effect of the Subordination Agreement on PCC's Claims and Counterclaims*

■ Drill Masters has moved for summary judgment on PCC's counterclaim for breach of contract based on the Note, and the Halls have moved for summary judgment on PCC's claim for tortious interference and counterclaim for declaratory judgment. Drill Masters and the Halls argue that these claims seek as relief pay-

ment on the Note and are therefore precluded by the terms of the Subordination Agreement.

The Subordination Agreement subordinates the Note to the Commercial Loan Agreement, both with respect to payment of the debt owed to PCC and priority of PCC's lien.

Section 2 of the Subordination Agreement provides:

> *General.* The Subordinated Debt and any and all Subordinated Documents shall be and hereby are subordinated and the Borrower is not permitted to pay, and the Subordinating Creditor is not permitted to receive, any payment on the Subordinated Debt until the full and final payment in cash of the Senior Debt, whether now or hereafter incurred or owed by the Borrower. Notwithstanding the foregoing sentence, the Borrower shall be permitted to make, and the Subordinating Creditor permitted to receive, scheduled interest payments pursuant to the Subordinated Agreement[ ], *provided* that no Event of Default has occurred and is continuing under the Senior Debt or would exist as a result thereof. In addition thereto, *provided* that no Event of Default has occurred and is continuing under the Senior Debt or would exist as a result thereof, Borrower may make principal payments to Subordinating Creditor pursuant to the terms of the Subordinated Agreement. Bank agrees not to change the definition of Debt Service Coverage Ratio as defined in the [Commercial] Loan Agreement.

(Subordination Agreement § 2).

Section 3 of the Subordination Agreement provides, in pertinent part:

> *Enforcement.* The Subordinating Creditor will not take or omit to take any action or assert any claim with respect to the Subordinated Debt or otherwise

which is inconsistent with the provisions of this agreement. Without limiting the foregoing, the Subordinating Creditor will not assert, collect or enforce the Subordinated Debt or any part thereof or take any action to foreclose or realize upon the Subordinated Debt or any part thereof or enforce any of the Subordinated Documents except to the extent (but only to such extent) that the commencement of a legal action may be required to toll the running of any applicable statute of limitation....

(Subordination Agreement § 3).

Thus, Drill Masters can make payments on the Note if no "Event of Default" has occurred and is continuing. The "Senior Debt" is indebtedness of Drill Masters to People's Bank. The Subordination Agreement provides that terms not otherwise defined in that document have the meanings that are given to them in the Commercial Loan Agreement, and the term "Event of Default" is not defined in the Subordination Agreement.

Section 6 of the Commercial Loan Agreement provides, in pertinent part, that:

> Each of the following shall constitute an Event of Default under the Loan Documents:
>
> (i) the failure beyond any applicable cure periods to keep, perform or carry out any obligation under the Notes [between Drill Masters, Inc. and People's Bank] or any obligation of the Loan Documents beyond any applicable cure periods or the occurrence of any default in another obligation of Borrower [ (i.e., Drill Masters, Inc.) ] or Guarantors [ (i.e., the Halls, inter alia) ] to the Bank [ (i.e., People's Bank) ]; or (ii) the failure to pay interest or principal when due pursuant to the Notes; ... or (v) the actual or threatened waste, removal or

demolition of any material part of any collateral that may now or hereafter secure the Loans; or (vi) the failure of the Guarantors or any other guarantor of the Loan Documents to observe, perform or comply with any obligation, condition or covenant under their guaranty of the Borrower's obligations to Bank under the Loan Documents; . . . or (xi) any encumbrance or lien filed against or any sale, conveyance, lease or transfer of, the Borrower's right, title or interest in the Collateral; or (xii) the occurrence of any condition or any change in Borrower's or any Guarantor's financial condition which in Bank's reasonable business judgment materially and adversely affects the Borrower's or any Guarantor's ability to pay or perform under any of the Loan Documents; . . . or (xiv) the occurrence of any Event of Default in any other loans or other agreements now existing or hereafter made between Bank, Borrower and/or any Guarantor and/or any Affiliate or Subsidiary of Borrower or Guarantors; or (xv) any default under the PCC Note; or Bank elects not to renew the Revolving Loan. (Commercial Loan Agreement (Doc. No. 113–3, Ex. 6) § 6).

Also, Section 5 of the Subordination Agreement provides Drill Masters and People's Bank with the right to restrain PCC from taking steps to collect on the Note:

> ***Defense to Enforcement.*** If the Subordinating Creditor, in contravention of the terms of this Agreement, shall commence, prosecute or participate in any suit, action or proceeding against the Borrower, then the Borrower may interpose as a defense or plea the making of this Agreement, and the Bank may intervene and interpose such defense or plea in its name or in the name of the Borrower. If the Subordinating Creditor, in contravention of the terms of this Agreement, shall attempt to collect any of the Subordinated Debt or enforce any of the Subordinated Documents, then the Bank or the Borrower may, by virtue of this Agreement, restrain the enforcement thereof in the name of the Bank or in the name of the Borrower.

(Subordination Agreement § 5).

Drill Masters and the Halls contend that PCC cannot enforce the Note because certain Events of Default have occurred and are continuing. First, they argue that an Event of Default exists under § 6(i) of the Commercial Loan Agreement because PCC breached its obligation to investigate and remediate the Property. PCC entered into the Environmental Indemnity Agreement for the benefit of People's Bank. That Environmental Indemnity Agreement constitutes a "loan document," being listed as such in a schedule to the Commercial Loan Agreement. In § 6 of the Environmental Indemnity Agreement, PCC agrees with People's Bank to take the same actions that it agreed to take with respect to the Transfer Act requirements in § 7.4 of the Asset Purchase Agreement. Thus, Drill Masters and the Halls argue that PCC has failed to carry out an obligation under a loan document and that failure constitutes an Event of Default under § 6(i) of the Commercial Loan Agreement.

PCC argues that the plain language of § 6 makes it clear that Events of Default relate to Drill Masters' default only. It contends that each Event of Default refers unambiguously to actions or inaction taken by Drill Masters or events under its control that would affect Drill Masters' ability to repay the loan to People's Bank. Thus PCC construes § 6(i) as referring only to a failure by Drill Masters or any guarantor of the People's Bank loan. However, that is not accurate. While most of the Events

of Default refer to actions or inaction taken by Drill Masters or events under Drill Masters' control that would affect its ability to repay the loan, some occurrences that would constitute an Event of Default do not fall within that description: actual or threatened waste or demolition as contemplated by § 6(v); the filing of an encumbrance or lien against the Property as contemplated by § 6(xi); and People's Bank simply not electing to renew a revolving loan for reasons unrelated to the borrower or the guarantor or the collateral, as contemplated by § 6(xv).

The court finds that the language in § 6(i) is ambiguous. Although the second part of § 6(i) specifically refers to the occurrence of a default in another obligation of "Borrower or Guarantors to the Bank," the first clause talks about "the failure" but does not specify whose failure notwithstanding the fact that parties other than the bank and the borrower and guarantors, i.e. PCC, are parties to "loan documents." A genuine issue of material fact exists as to the parties' intent with respect to § 6(i).

Drill Masters and the Halls also argue that an Event of Default exists under § 6(xii). They contend that as a result of the failure by PCC to clean up the Property, Drill Masters was required to post almost $900,000 in additional cash collateral. They submit the affidavit of Thomas Hall. He states in part that "It was clear to me, based on discussions with People's Bank, that if we did not provide People's Bank with additional collateral, it would take action which I understood to mean that it would find DMI in default and call our loans." (Thomas Hall Decl. (Doc. No. 141–1) ¶ 3). However the occurrence or change referenced in § 6(xii) is one which in the "Bank's reasonable business judgment materially and adversely affects the Borrower's or any Guarantor's ability to pay or perform under any of the Loan Documents." (Commercial Loan Agreement § 6(xii)). There is no statement from the Bank provided, simply Thomas Hall's explanation of what was clear to him and what he understood. Thus a genuine issue of material fact exists with respect to § 6(xii).

Finally, Drill Masters and the Halls argue that an event of default exists under § 6(xv) because there has occurred and is continuing a default under the Note. PCC acknowledges that Drill Masters' "default under the Note itself constitutes an 'Event of Default'" (PCC's Mem. Opp. Mot. Summ. J. (Doc. No. 139) at 33) but it makes no effort to explain why the existence of such an Event of Default does not serve to trigger the provisions in § 2 of the Subordination Agreement. The inclusion of default under the Note among the Events of Default provided Drill Masters and the Halls with the opportunity to intentionally fail to make a payment under the Note and thereby create an Event of Default, the existence of which served to preclude any further payments under the Note. It is doubtful that is what PCC sought to accomplish by incorporating into the Subordination Agreement the definition of Event of Default from the Commercial Loan Agreement.[3] However, the lan-

---

3. The court notes that PCC does not contend that there was a drafting mistake that could be subject to judicial reformation in incorporating wholesale into the Subordination Agreement the definition of Event of Default from the Commercial Loan Agreement. *See Traggis v. Shawmut Bank Conn. N.A.*, No. 374302, 2001 WL 34093645, at *1 (Conn.Su-per.Ct. Jan. 31, 2001) ("It is well established that the standard of proof in reformation cases is 'clear, substantial and convincing evidence.'" (quoting *Lopinto v. Haines*, 185 Conn. 527, 534, 441 A.2d 151 (1981))). In any event it may be more practicable to obtain a waiver from People's Bank, in accordance with § 21 of the Subordination Agree-

guage is clear and unambiguous so the writing is to be given effect according to its terms. *See Conn. Nat. Bank v. Rehab Assocs.*, 300 Conn. 314, 319, 12 A.3d 995 (2011) ("Where the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms." (brackets in original)). Thus, as to an obligation to make payments under the Note, there was no obligation to make payments after an Event of Default had occurred and was continuing and the failure to make the first payment under the Note constituted such an Event of Default.

However, with respect to the provision in the Subordination Agreement which provides that PCC will not take any action to collect or enforce the Note, Drill Masters and the Halls do not address the clause in § 3 that allows PCC to commence a legal action to the extent required to toll the running of any applicable statute of limitation. Thus it is not apparent that PCC's counterclaim for breach of contract based on the Note and PCC's claim for tortious interference and counterclaim for declaratory judgment are precluded by the terms of the Subordination Agreement.

Therefore, because genuine issues of material fact exist with respect to the Events of Default set forth in §§ 6(i) and 6(xii) of the Commercial Loan Agreement and Drill Masters and the Halls have not met their initial burden with respect to the Event of Default set forth in § 6(xv), the motion for summary judgment is being denied with respect to the argument by Drill Masters and the Halls that the Subordination Agreement precludes PCC's claims.

### I. *PCC Counterclaims*

PCC has moved for summary judgment on its counterclaims against Drill Masters

for breach of contract with respect to the Note and for a declaratory judgment.

### 1. *Breach of Contract—the Note*

■ "A promissory note is nothing more than a written contract for the payment of money, and, as such, contract law applies .... Where there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law." *Fid. Bank v. Krenisky*, 72 Conn.App. 700, 707, 807 A.2d 968 (2002) (ellipses in original omitted).

■ In the Note, Drill Masters promised to pay PCC $1,162,000 plus interest by the "Payment Date" of November 15, 2004. The Note provides that:

> if on the Payment Date either (i) the outstanding principal amount of [Drill Masters]'s aggregate term debt to People's Bank for money borrowed under the Commercial Loan Agreement, dated November 15, 2002 between [Drill Masters, Inc.] and People's Bank ... on or before the date of this Note exceeds $1,500,000, or (ii) [Drill Masters, Inc.] does not meet its Debt Service Coverage Ratio as defined in Section 4.5 of the [Commercial] Loan Agreement, then the Payment Date shall be extended to the first business day in which neither condition set forth in (i) and (ii) shall exist.

(Note at 1).

By 2006 or 2007, neither of conditions (i) or (ii) existed. On June 9, 2006, People's Bank sent a "Commitment Letter" to Thomas Hall as the President of Drill Masters, Inc. As to condition (i), the Commitment Letter demonstrated that Drill Masters' aggregate debt to People's Bank

ment, than to establish by "clear, substantial and convincing evidence" that the contract

should be judicially reformed.

was less than $1,500,000 on June 9, 2006. It stated that Drill Masters, Inc. had "two existing term loans totaling approximately $325,000." (Commitment Letter (Doc. No. 113–3, Ex. 10) at 1.) As to condition (ii), People's Bank advised Drill Masters, Inc. in the Commitment Letter that it had approved a $1,250,000 term loan to Drill Masters, Inc., which would allow Drill Masters, Inc. to repay the Note without violating the Debt Service Coverage Ratio covenant. Thomas Hall admitted during his deposition that Drill Masters was in compliance with the Debt Service Coverage Ratio at some time in 2006. Thus, payment on the Note was due in 2006, and by January 2007, Thomas Hall recognized that Drill Masters was required to pay back the Note. (See Thomas Hall Dep. (Doc. No. 113–3, Ex. 7) at 169–70 (Q: "you understood that at least at that point [i.e., January 2007], your contract with PCC absolutely required [you to] start paying back on the note; correct?" A: "We did, but—").)

There is no genuine issue of material fact regarding Drill Masters' obligation to pay the Note as of June 9, 2006 at the latest. Therefore, PCC's motion for summary judgment as to its counterclaim for breach of contract as to the Note is being granted.

### 2. Set–Off

In its answer to the counterclaims, Drill Masters asserts that "PCC's counterclaims are barred by [the] doctrine of setoff as it has caused [Drill Masters] damages far in excess of the amount alleged due under the Counterclaims." (Drill Masters' Answer to Countercls. (Doc. No. 78) at 3.) Drill Masters contends that that the doctrine of setoff makes summary judgment on PCC's claims inappropriate.

 "In Connecticut, a setoff may be legal or equitable in nature." *OCI*

*Mortg. Corp. v. Marchese*, 255 Conn. 448, 463, 774 A.2d 940 (2001).

> Legal setoff is governed by General Statutes § 52–139 *et seq.* and involves mutual debts between parties in any action: (1) to recover on a debt pursuant to § 52–139; (2) by an assignee of a nonnegotiable chose in action pursuant to General Statutes § 52–140; (3) for trespass to real or personal property or other tort committed without force pursuant to General Statutes § 52–141; or (4) involving joint debtors pursuant to General Statutes § 52–142.

*Id.* at 463–64, 774 A.2d 940. Section 52–139, which is the statutory setoff provision applicable to this case, provides in pertinent part that "[i]n any action brought for the recovery of a debt, if there are mutual debts between the plaintiff or plaintiffs, or any of them, and the defendant or defendants, or any of them, one debt may be set off against the other." Conn. Gen.Stat. § 52–139(a). However, "[a]n unliquidated claim cannot be set off in an action in assumpsit." *General Consol. Ltd. v. Rudnick and Sons, Inc.*, 4 Conn.Cir.Ct. 581, 587, 237 A.2d 386 (1967); *see also Comley v. O & G Indus., Inc.*, No. 0118104, 1994 WL 65308 (Conn.Super.Ct. Feb. 24, 1994) (striking a setoff defense because, *inter alia*, the debt, which arose from past environmental remediation costs, was unliquidated). Any debt owed by PCC relating to its obligations under the Asset Purchase Agreement and the Transfer Act is unliquidated. Thus, Drill Masters is not entitled to legal setoff.

> When the statutes governing legal setoff do not apply, a party may be entitled to equitable setoff, nonetheless, only to enforce the simple but clear natural equity in a given case. The right to setoff, although it may arise out of a written instrument, is a common law equitable

right that is not itself a written instrument.

*OCI Mortg. Corp.*, 255 Conn. at 464, 774 A.2d 940 (internal citations and quotation marks omitted). "An equitable set-off claim is reserved for those circumstances where the nature of the underlying claim is such that the parties cannot obtain full redress by means of a separate action." *Wojcik v. Wojcik*, CV 960054671S, 1997 WL 97362, at *1 (Conn.Super.Ct. Jan. 30, 1997) (citing *Peter Cascio Nursery, Inc. v. Green Acres, Inc.*, 3 Conn.Cir. 424, 428, 216 A.2d 856 (1965); *Hubley Mfg. and Supply Co. v. Ives*, 81 Conn. 244, 247, 70 A. 615 (1908)); *see also Household Realty Corp. v. Kujawski*, No. CV085004992S, 2010 WL 3960735, at *5 (Conn.Super.Ct. Sept. 3, 2010). Here, however, full redress is available to Drill Masters by means of a separate action. Indeed, Drill Masters has sought redress by means of its claims against PCC in this action. Thus, equitable setoff is not necessary for Drill Masters to receive relief and, consequently, is not available to Drill Masters.

Therefore, PCC's motion for summary judgment is being granted as to Drill Masters' affirmative defense of right of setoff.

### 3. Costs and Expenses of Collecting Debt

PCC has moved for summary judgment with respect to costs and expenses incurred by PCC in collecting on the Note, in addition to principal and interest owed on the Note. The Note provides that:

> [Drill Masters] agree[s] to pay to [PCC] all costs and expenses incurred by [PCC] in the collection of this, Secured Promissory Note, including reasonable attorneys' fees, at the pre-trial, trial and appellate levels.

(Note (Doc. No. 113–3, Ex. 1) at 1). This contract language is clear and unambiguous, so there is no genuine issue of material fact as to Drill Masters' obligation under this provision of the Note.

Therefore, PCC's motion for summary judgment is being granted as to its claim that Drill Masters is liable for the costs and expenses incurred by PCC in collecting the indebtedness owed under the Note. The amount of costs and expenses are left for future determination.

### 4. Breach of Covenants in Amendment No. 1

PCC has moved for summary judgment on its counterclaim for a declaratory judgment that Drill Masters violated the covenants in Amendment No. 1 to the Asset Purchase Agreement, causing Drill Masters to "be out of compliance with the Debt Service Ratio to the bank." (PCC's Mem. Supp. Mot. Summ. J. (Doc. No. 113) at 6).

In Section 7 of Amendment No. 1, Drill Masters and PCC agreed that Drill Masters would be subject to various covenants and restrictions in favor of PCC. Section 7 states in pertinent part:

> Purchasers agree that Purchasers shall provide to Sellers and for Seller's benefit the same substantive covenants and agreements to be provided to Bank and listed under the headings "Affirmative Covenants" and "Negative Covenants" in the final form of Commercial Loan Agreement between DMI and Bank, substituting where appropriate Seller for Bank, provided, however, that Seller shall conduct any audit at its own expense. In addition, Purchasers also agree that while any amount remains outstanding under the Note, Purchasers shall not without prior consent of Seller (which consent shall not be unreasonably withheld taking into account any adverse effect on the timely repayment of the Note) (i) . . . , or (ii) make capital expenditures in excess of $35,000 in the aggregate, incur research and development

expense, or otherwise divert resources of DMI to investment-type activities....
(Amendment No. 1 (Doc. No. 113–3, Ex. 2) § 7). In "Section 5–Negative Covenants" of the Commercial Loan Agreement, Drill Masters covenanted and agreed that

until payment is made in full of the Notes and the performance of all of the other obligations hereunder and under any of the Loan Document[s], unless the Bank otherwise consents in writing, the Borrower shall not [*inter alia*]:

. . .

5.11—*Officer Compensation.* Borrower shall not pay compensation of more than $300,000.00 in the aggregate in any fiscal year to Thomas Hall and John Hall. 5.12—*Rent.* Borrower shall not pay rent (inclusive of taxes and operating expenses) to Drill Masters Realty, LLC ("Realty") for the property located at 336 Boston Post Road, Milford, Connecticut, in excess of 1.1 times Realty's annual debt service on Realty's $1,280,000.00 note of even date to Bank.

. . .

(Commercial Loan Agreement § 5).

PCC contends that Drill Masters breached three of its covenants to PCC by making capital expenditures in excess of $35,000 per year, by paying Tom and John Hall more than $300,000 in the aggregate per year, and by Drill Masters Inc. making rent payments to Drill Masters Realty exceeding 1.1 times the annual debt service on the $1,280,000 note to People's Bank.

With respect to the $35,000 cap on capital expenditures, Thomas Hall testified that around May 2003 he spoke with PCC's president, Greg Delaney ("Delaney"), about exceeding the $35,000 cap to upgrade Drill Masters' software and hardware because the cost of the entire upgrade was approximately $100,000. Delaney granted Drill Masters permission to go forward with the first phase of the upgrade, which cost just under $35,000, but asked that Drill Masters not complete the upgrade until PCC was paid. Despite the fact that Drill Masters did not have permission to exceed the $35,000 capital expenditure cap, it went forward with the entire upgrade. Additionally, Thomas Hall testified about Drill Masters' subsequent capital expenditures in excess of $35,000 as follows:

Q. So you made the decision not to approach [Delaney] with respect to additional capital expenditures that exceeded the $35,000; correct?

A. Yes.

Q. And you continued in 2004, 2005 and 2006 to make capital expenditures that exceeded the $35,000 limitation; correct?

A. Yes.

Q. And not one time did you go [to] Mr. Delaney and ask him in 2004, 2005 or 2006 whether he would approve capital expenditures; correct?

A. Correct.

(Thomas Hall Dep. at 38:23–39:13). Because Thomas Hall has admitted that Drill Masters made capital expenditures in excess of $35,000 in multiple years without first obtaining the consent of PCC,[4] there is no genuine issue of as to the fact that Drill Masters violated its covenant to PCC.

 As to the covenant that officer compensation would not exceed $300,000 in the aggregate per year, Drill Masters' consolidated financial statements for the years ending 2002 to 2007 show that officer com-

---

4. *See also* Drill Masters' Local Rule 56(a)(2) Stmt. (Doc. No. 150) ¶ 11 (admitting that Drill Masters breached the capital expenditure limit contained in Amendment No. 1 to the Asset Purchase Agreement).

pensation was $299,447 in 2002; $322,238 in 2003; $316,421 in 2004; $448,143 in 2005; $449,603 in 2006; and $559,818 in 2007. (*See* Financial Statements (Doc. No. 113–3, Ex. 8) at 17, 32, 47, 64 and 81). Thomas Hall testified that Drill Masters obtained a waiver from People's Bank to exceed the $300,000 limitation. However, with respect to asking PCC for the same waiver, Thomas Hall testified as follows:

Q. Do you remember why it was you chose to ask the bank for a waiver, but did not choose to ask Mr. Delaney for the waiver?

A. Again, I was not getting any reasonable response from the first time that [Delaney] and I spoke about the situation.

Q. Can you give me an example of a circumstance in which Mr. Delaney rejected one of your requests for increasing your aggregate compensation, your and your brother's aggregate compensation?

A. I never discussed it with [Delaney].

(Thomas Hall Dep. at 55:7–55:21). Because Drill Masters paid officer compensation in excess of $300,000 without obtaining a waiver from PCC, there is no genuine issue as to the fact that Drill Masters violated its covenant to PCC.

With respect to the covenant not to pay rent to Drill Masters Realty in excess of 1.1 times Drill Masters Realty's annual debt service on the $1,280,000.00 note, Drill Masters admits that "DMI and Realty breached the rent limitation in Amendment No. 1 to the [Asset Purchase Agreement]." (PCC's Local Rule 56(a)(1) Stmt. (Doc. No. 114) ¶ 13; *see also* Drill Masters' Local Rule 56(a)(2) Stmt. ¶ 13 (admitting ¶ 13 of 56(a)(1) Stmt.)). Thus, there is no genuine issue as to the fact that Drill Masters violated its covenant to PCC.

Therefore, PCC's motion for summary judgment is being granted as to PCC's counterclaim for a declaratory judgment that Drill Masters violated three covenants to PCC in Amendment No. 1 to the Asset Purchase Agreement.

### J. *Tortious Interference with Contractual Relations*

█ The Halls have moved for summary judgment on PCC's claim for tortious interference with contractual relations, which is based on the Halls' alleged role in Drill Masters' breach of the covenants in Amendment No. 1 to the Asset Purchase Agreement. In order to prevail on a claim for tortious interference with contractual relations, a plaintiff must establish "(1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Appleton v. Bd. of Educ.*, 254 Conn. 205, 212–13, 757 A.2d 1059 (2000).

█ The court previously denied a motion for summary judgment on the tortious interference claim. (*See* Order re Mot. to Dismiss and for Summ. J. (Doc. No. 66 in *PCC v. Hall*) at 5). The Halls contend, however, that evidence produced during discovery demonstrates that summary judgment should be granted in their favor. The Halls point to two lines of evidence which were unavailable to the court when it ruled on the prior motion for summary judgment. First, the court has more extensive analysis regarding PCC's conduct relating to investigation of the Property, as well as Thomas Hall's testimony that he believed he had no way protect his assets and his business's assets if he were to pay PCC. Hall testified that he has not paid

PCC because "our site still has not been characterized.... And I don't have any way of protecting the business assets and my assets without—you know, by me paying them, I would lose complete leverage of being able to get the [P]roperty remediated properly.") (Thomas Hall Dep. at 257.) Second, the court has Thomas Hall's testimony that Drill Masters accumulated almost enough cash to pay PCC. The Halls argue that, with this additional evidence, "there is no issue of fact that the Halls did not fail to pay PCC so that they could enrich themselves" and that, therefore, they are entitled to summary judgment under *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir.1995).

In *Boulevard Assocs.* the court explained the rationale underlying the general principle that an officer, employee, or shareholder of a corporation or other business entity generally cannot be held liable for tortiously interfering with a contract of that entity:

> As one court has explained: An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract. An agent, however, can be held liable for such interference or inducement if he did not act legitimately within his scope of duty but used the corporate power improperly for personal gain.

*Id.* at 1036 (holding that tenant's parent company was not liable for tortious interference for causing a breach of lease between tenant and tenant's former landlord). The court continued:

> Because there is a significant unity of interest between a corporation and its sole shareholder—indeed, an even great-

er unity than that which exists between a corporation and its agents or officers—we do not believe that such a shareholder can be considered a third party capable of "interfering" with its own company's contracts. Certainly, this unity of interest is not called into question when the shareholder's actions are taken to safeguard the interests of its company.

*Id.* However, the court went on to make clear a limitation on the extent of its holding:

> We take care to explain what we do not hold today. We do not hold that a sole shareholder is privileged to employ any means, no matter how improper, to induce a breach of a contract involving its own company. Most states affording a privilege to sole shareholders have recognized that certain behavior may be sufficiently egregious to cross the line and become tortious.... Accordingly, only a limited and qualified privilege to sole shareholders comports with the general rule under Connecticut law that actions involving "fraud, misrepresentation, intimidation or molestation" or "malic[e]" may give rise to a claim of tortious interference with contract, *Kecko Piping Co. v. Town of Monroe,* 172 Conn. 197, 201, 374 A.2d 179, 182 (1977) (citations omitted), and that to make out such a claim the plaintiff must prove "some improper motive or improper means." *Blake v. Levy,* 191 Conn. 257, 262, 464 A.2d 52, 55 (1983).

*Id.* at 1037.

*Boulevard Assocs.* was quoted and followed by the court in *Malik v. Carrier Corp.,* 202 F.3d 97, 109 (2d Cir.2000). In *Malik,* the court also cited with approval *Espinosa v. Connecticut College,* No. 52 28 72, 1994 WL 320222, at *5 (Conn.Super.Ct. June 27, 1994), and quoted the following language from *Espinosa:* "In order to de-

prive a corporate employee of his immunity, the plaintiff must establish that he acted solely for his own benefit and benefit to the corporation played no role therein." However, the sentence following the language in *Espinosa* quoted in *Malik*, not material in *Malik*, but material here, is as follows:

> Such a defendant is insulated from liability even if his actions were motivated in part by self-interest, provided he believed he was serving the corporate defendant.

*Espinosa*, 1994 WL 320222, at *5.

While the new evidence presented by Drill Masters tends to support the Halls' argument that they were motivated by a desire to benefit Drill Masters and believed they were serving Drill Masters through their conduct, genuine issues of material fact nonetheless exist as to whether the Halls were motivated solely by self-interest or a desire to benefit Drill Masters was a motivating factor, and whether the Halls believed they were serving Drill Masters.

Therefore, the motion for summary judgment as to the claim for tortious interference with contractual relations is being denied.

### K. *Unjust Enrichment*

Although Drill Masters and the Halls state that they have moved for summary judgment "on all claims and counterclaims in both actions except for its claim that it lost a sale because [PCC] failed to timely investigate the contamination" (Drill Masters Mot. Summ. J. (Doc. No. 115)) and the complaint in *PCC v. Hall* asserts a claim for unjust enrichment, the memorandum in support of the Halls' motion for summary judgment does not address PCC's claim for unjust enrichment. Thus, the Halls have failed to meet their initial burden at the summary judgment stage. Therefore, the Halls' motion for summary judgment is being denied as to the unjust enrichment claim.

### L. *Joinder of Necessary Parties*

■ Drill Masters argues that PCC's motion for summary judgment should be denied because People's Bank and the City of Milford (the "City") are necessary parties under Fed.R.Civ.P. 19(a)[5] that PCC failed to join. (*See* Drill Masters' Mem. Opp. Mot. Summ. J. at 20 n. 6.) Neither People's Bank nor the City is a necessary party to this action. Complete relief between the existing parties (i.e., Drill Masters, the Halls, and PCC) can be accorded without the involvement of People's Bank or the City. Moreover, issues between the existing parties and People's Bank and/or the City can be addressed separately without impairing the rights of People's Bank or the City, or putting the existing parties at risk of multiple or inconsistent obligations.

## IV. CONCLUSION

For the reasons set forth above, the Motion for Partial Summary Judgment by

---

**5.** Federal Rule of Civil Procedure 19(a)(1) provides that:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Defendant PCC Specialty Products, Inc. (Doc. No. 112) is hereby GRANTED in part and DENIED in part, and the Motion for Summary Judgment (Doc. No. 115) by Drill Masters–Eldorado Tool, Inc., Drill Masters Realty, Inc., Thomas Hall, and John Hall is hereby DENIED.

In *Drill Masters v. PCC,* summary judgment shall enter in favor of defendant PCC Specialty Products Inc. (1) with respect to the Second Amended Complaint, as to Count One, breach of contract, only the claims based on unemployment insurance costs and the TSCA; as to Count Three, the negligence claim; and as to the plaintiffs' claim for consequential damages; and (2) with respect to the Counterclaims, as to the first counterclaim, which is for breach of contract with respect to the Note; as to the second counterclaim, which is for a declaratory judgment that the plaintiffs violated the covenants in Amendment No. 1; as to the plaintiffs'/counterclaim defendants' affirmative defense of right of setoff; and as to the claim for costs and expenses incurred in collecting on the Note.

It is so ordered.